IN THE MATTER OF THE ESTATE OF
ROBERT E. HOFFMAN, DECEASED.

Argued April 2, 1973—Decided May 21, 1973.

*Mr. Phillip F. Guidone* argued the cause for the appellant Audrey Hoffman (*Messrs. Beck, Reichstein & Guidone,* attorneys; *Mr. Ronald Reichstein,* of counsel; *Mr. Phillip F. Guidone,* on the brief).

*Mr. Stuart L. Pachman* argued the cause for the cross-appellant Philip B. Brooks (*Messrs. Clapp & Eisenberg,* attorneys; *Mr. Stuart L. Pachman,* on the brief).

*Mr. Adrian M. Unger* argued the cause for the respondent Gene R. Hoffman, Executor of the Estate of Robert E. Hoffman, deceased (*Messrs. Milton M. and Adrian M. Unger,* attorneys; *Mr. Adrian M. Unger and Mr. Lawrence Kantor, Jr.,* on the brief).

The opinion of the Court was delivered by

PROCTOR, J. This case concerns the distribution of the proceeds of two federal income tax refund checks totaling $31,284.89. The checks are payable to "Robert and Audrey Hoffman." Robert is now deceased and his estate is insolvent. The sole assets available for distribution are the proceeds of the checks, and the question before us is the priority of the respective claims to the money made by Robert's former wife Audrey Hoffman; his accountant Philip B. Brooks; and Robert's estate.

Robert and Audrey Hoffman were married on February 4, 1954. Audrey was granted a judgment nisi in an action for divorce on October 13, 1965. The judgment granted Audrey custody of the the three children of the marriage and, in lieu of alimony and child support, incorporated a separation agreement entered into between Audrey and Robert on June 21, 1965.

The agreement provided that Robert would pay $85 per week for Audrey's support, and $125 per week for the support of the children. The payments to Audrey would cease upon the death of either Robert or Audrey or upon her remarriage; the payments for each child would cease upon attaining the age of twenty-one or upon emancipation. The agreement further provided that Robert would maintain at least $25,000 in life insurance coverage on his life for each of the three children.

Audrey agreed to rear the children and provide for all other of their expenses not expressly required to be paid by Robert. She also promised to convey all rights to the family home upon Robert's payment to her of $5,000.

Paragraph 17 of the agreement concerned the filing of joint income tax returns. for the years of their marriage:

"Within 5 days after so requested by the husband, the wife shall furnish the husband with all necessary and pertinent information as to her income, expenses and taxable gains and losses for income tax purposes and will sign any joint Federal or state income tax returns and other necessary documents, provided they are not false or fraudulent, for any year or years, including those for the year 1964, during which they shall have been husband and wife. If the wife fails or refuses to do so, all provisions herein for her support and maintenance shall forthwith be of no force and effect. All liabilities on joint income tax returns heretofore and hereafter filed jointly by the parties shall be borne by the husband, who will indemnify and hold the wife harmless from any claim or expense arising out of any such returns, except that the wife shall be liable for taxes on dividends and interest received by her in excess of $500. per year and for taxes on all income earned by her, which taxes shall be computed as if such dividends, interest and income were her only income and she were single. All audits, examinations, suits or other proceedings in connection with those returns shall be handled, at his own cost and expense, by the husband and by the counsel or the accountant selected by him, but, at the request of the husband, the wife shall participate therein and execute papers to the extent reasonably required by such counsel or such accountant. All refunds recovered with respect to those returns shall belong entirely to the husband, except as to the wife's separate income, and the wife will promptly sign or endorse any receipts, vouchers or refund checks required to effect the collection of such refunds by the husband."

Paragraph 20 of the agreement provided:

"The waiver of any individual clause in the within agreement or the failure on the part of either party to insist upon the strict performance of any particular clause or obligation shall not be considered a waiver of the remainder of the said agreement, but the balance of the agreement shall continue in full force and effect."

On February 9, 1967, Audrey filed a motion in the Chancery Division of the Superior Court to hold Robert in contempt of the 1965 divorce decree. She claimed arrearages for her support and the support of her children of $1,050 as of January 28, 1967; she also demanded proof of the existence of the life insurance policies for the benefit of the children and a full account of Robert's financial

affairs. On March 30, 1967, Audrey filed another motion for a contempt order, alleging that the arrearages had then reached $2,940. The Chancery Division adjourned both motions without date, noting that defendant apparently was without funds and confined to a hospital for psychiatric care. However, the court directed the attorneys for the parties to confer about Robert's financial situation. Apparently nothing resulted from this conference, since a subsequent application was filed by Audrey on April 26, 1968, in which she sought to fix her arrearages at $6,007, and asked for permission to serve interrogatories directed to Robert's financial affairs. In an order filed August 30, 1968, the court denied Audrey's motion to fix the arrearages and hold Robert in contempt, but granted her leave to serve interrogatories.

Robert Hoffman died on September 30, 1968. After his death, the successor trustee of the Robert Hoffman Chevrolet Employees Profit Sharing and Retirement Plan, a judgment creditor of the decedent, brought an action in the Chancery Division in which the trustee sought a determination of the rights to the proceeds of two federal income tax refund checks. The checks — one for $2,442.85 received June 13, 1967, and one for $28,842.04 received September 30, 1968 — are both payable to "Robert and Audrey Hoffman," and were issued as a result of the filing of amended joint tax returns for the years 1964 and 1965. The returns were prepared and filed by Philip Brooks, the accountant for Robert Hoffman. The trustee asked that the checks, which were in the possession of Brooks, be turned over to the court pending further proceedings. The checks had been mailed directly to Brooks, but Audrey refused to endorse the first check and Robert died at about the time of the delivery of the second.

Subsequently, on September 9, 1969, the Chancery Division ordered that Robert's last will and testament be admitted to probate and that letters testamentary be issued to Gene Hoffman, the decedent's brother, as executor of

the estate. The court also directed that the tax refund checks be surrendered to the executor; that the checks be endorsed by the executor and Audrey; and that the proceeds of the checks be deposited in a trust account pending determination by the court of the claims to the money. No further proceedings were taken in the Chancery Division.

On November 11, 1970, the executor filed a complaint in the Probate Division of the Essex County Court asking that the estate of Robert Hoffman be declared insolvent. According to the account of the estate filed by the executor, the only assets available were $31,284.89, the amount of the two federal income tax refund checks. Total claims against the estate were well in excess of the proceeds of the checks. Among the claims were a balance due of $16,177.43 on a judgment entered July 14, 1967, in favor of the Bank of Passaic and Clifton, and the judgment in the amount of $68,185.81, entered July 22, 1968, in favor of the trustee of the Robert Hoffman Chevrolet Employees Profit Sharing and Retirement Plan.

The court ordered that the proceeds of the checks be distributed according to *N. J. S. A.* 3A:24-2.[1] The court thus directed that the proceeds be used for payment of the funeral expenses, the administration expenses, and the claim of the Passaic and Clifton Bank, with any remaining funds to go in partial payment of the judgment of the trustee of the Robert Hoffman Chevrolet Employees Profit Sharing

---

[1] *N. J. S. A.* 3A:24-2 provides:

"The following expenses and debts shall have preference and be paid out of the personal and real estate of the decedent, according to the following order:

1. Funeral expenses.

2. Administration expenses.

3. Debts entitled to a preference under the laws of the United States.

4. Hospital, physicians' and nurses' bills during the last illness.

5. Judgments entered against the deceased according to the priority of their entries respectively.

Preference shall not be given to the payment of one item over other items of the same paragraph except as stated in paragraph 5."

and Retirement Plan. The court determined that since neither Audrey Hoffman nor Philip Brooks had reduced their claims to money judgments, they were general creditors subordinate to the claims of the judgment creditors.

Audrey Hoffman appealed to the Appellate Division, and Philip Brooks cross-appealed. In an unreported opinion the Appellate Division affirmed substantially for the reasons expressed by the County Court, and we granted certification on the petition of Audrey Hoffman and the cross-petition of Philip Brooks. 62 *N. J.* 202 (1973).

We deal first with the claim of Philip Brooks. He seeks to collect from the proceeds a fee of $2,275 for his preparation of the revised income tax returns. No one disputes the reasonableness of the amount of the fee. According to the affidavit filed by Brooks, sometime in 1966 Robert Hoffman told Brooks that he had been borrowing funds at high interest rates and had been speculating in the stock and commodities markets in the years 1964 and 1965. Brooks then informed Hoffman that income tax refunds might be obtained for 1964 and 1965 if amended returns were filed in which the interest payments were taken as deductions and the investment losses in the stock and commodity markets were claimed. At the time of this discussion Hoffman was without funds. He asked Brooks to prepare and file amended tax returns and promised to pay Brooks for his services out of the money that would be recovered, if any, in tax refunds. Brooks states that he agreed to do the work "only because of decedent's promise to pay me out of the proceeds of any income tax refunds that would be received." Brooks had arranged with Hoffman that any tax refund checks would be delivered directly to Brooks.

The trial court held that since Brooks had not obtained a judgment against Hoffman his claim was simply that of a general creditor, and therefore it was subordinate to those preferred claims under *N. J. S. A.* 3A:24-2. We believe the trial court misconstrued Brooks' position. Brooks does not raise his claim under *N. J. S. A.* 3A:24-2. Rather, he

argues that the refund proceeds are subject to an equitable lien in his favor which attached to the money before the statute is applied.

An equitable lien "may be created by express executory contracts relating to specific property then existing, or property to be afterward acquired; and sometimes they are raised *ex aequo et bono,* according to the dictates of equity and conscience, as where a contract of reimbursement could be implied at law . . ." *Temple v. Clinton Trust Company,* 1 *N. J.* 219, 226 (1948). See also *In re Loring,* 62 *N. J.* 336, 341 (1973). Such a lien is a right of a special nature in a fund and constitutes a charge or encumbrance upon the fund. See 4 *Pomeroy, Equity Jurisprudence* (5th ed. 1941) § 1233, p. 692; 51 *Am. Jur.* 2d, *Liens,* § 22, p. 160. Where one promises to pay for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will attach to the fund when it comes into existence. See *Morrison Flying Service v. Deming Nat'l Bank,* 404 *F.* 2d 856, 861 (10th Cir. 1968), *cert.* den. 393 *U. S.* 1020, 89 S. Ct. 628, 21 *L. Ed.* 2d 565 (1969); *Mitchell v. Bowman,* 123 *F.* 2d 445, 447 (10th Cir. 1941). In *Rutherford Nat'l Bank v. H. R. Bogle & Co.,* 114 *N. J. Eq.* 571 (Ch. 1933), the court described the creation of an equitable lien:

"The whole doctrine of equitable liens or mortgages is founded upon that cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done. To dedicate property, or to agree to do so, to a particular purpose or debt is regarded in equity as creating an equitable lien thereon in favor of him for whom such dedication is made. This wholesome equitable principle is one of wide, if not universal, recognition and application [citations omitted].

"The form which an agreement shall take in order to create an equitable lien or mortgage is quite immaterial, for equity looks at the final intent and purpose rather than at the form. If an intent to give, charge, or pledge property, real or personal, as security for an obligation appears, and the property or thing intended to be given, charged, or pledged is sufficiently described or identified, then the equitable lien or mortgage will follow as of course [citations omitted]." 114 *N. J. Eq.* at 573-574.

In *Wardman v. Leopold,* 66 App. D. C. 111, 85 *F. 2d* 277 (1936), *cert.* den. 299 *U. S.* 570, 57 S. Ct. 33, 81 *L. Ed.* 420 (1936), tax accountants were allowed an equitable lien on the proceeds of tax refund checks which their efforts obtained for a client. The court found that the agreement between the parties contemplated that the fees for the accountants' services should be satisfied out of the proceeds of the refund, and that consequently the sum due the accountants constituted a charge enforceable as an equitable lien on the tax refund. See also *Barnes v. Alexander,* 232 *U. S.* 117, 34 S. Ct. 276, 58 *L. Ed.* 530 (1914) (attorneys' contingent fee satisfied out of fund obtained through their efforts).

None of the parties has disputed that Robert Hoffman intended to pay the fee of Brooks from the amount received through the tax refund. Since the fund was created by the efforts of Brooks, we think that his claim falls within the definition of an equitable lien. Accordingly, before others receive the benefit of his efforts, equity requires that Brooks' claim be satisfied. See 2 *Pomeroy, Equity Jurisprudence, supra,* § 685, p. 948. See also *Rutherford Nat'l Bank v. H. R. Bogle & Co., supra,* 114 *N. J. Eq.* at 578–579. We thus conclude that the claim of Brooks should be satisfied first from the proceeds of the checks.

Audrey Hoffman's claim to the proceeds of the checks was also determined by the courts below to be simply that of a general creditor. Two reasons were given for this result. First, the trial court said that Paragraph 20 of the property settlement agreement "specifically states that a failure of either party to perform any part of the agreement does not mean that the balance of the agreement is inoperative or ineffective," and it thus concluded that a breach by Robert would not release Audrey from her promise to endorse the checks and recognize his sole ownership of the proceeds. However, we think that the court misconstrued this paragraph. This provision was not intended to make each party's promises under the agreement independent of

the other's performance, but rather was designed to permit one party to waive enforcement of certain obligations under the agreement without precluding that party from enforcing the remainder of the agreement. In the present situation, this provision therefore does not bar Audrey from raising Robert's breach of the agreement as releasing her from her promise with respect to the tax refunds.

The second reason given by the trial court to subordinate Audrey's claim was that Robert's alleged breach of the agreement had not been reduced to a money judgment by Audrey, and consequently her claim was only that of a general creditor subject to the claims accorded priority in *N. J. S. A.* 3A:24–2. In her brief on appeal, Audrey concedes that "the award of alimony and support possesses the force of a judgment at law only in those cases where the court has certified the amount thereof." Nevertheless, she argues that although her arrearages were never fixed by the court, her right to the proceeds of the checks is not dependent upon her position as a judgment creditor. Rather, she contends she is entitled to the proceeds before they become assets of the estate and subject to distribution under *N. J. S. A.* 3A:24–2.

Audrey first claims that she is a joint tenant, and thus entitled to the full amount of the proceeds of the checks. She cites *Ehrlich v. Mulligan,* 104 *N. J. L.* 375 (E. & A. 1928), where it was held that there was a right of survivorship in a note payable jointly to husband and wife. However, in the present case Robert and Audrey were divorced at the time the checks were issued. They were not designated as joint tenants in either check. Therefore, no right of survivorship was created, and we accordingly reject Audrey's claim to take the money as Robert's survivor.

Audrey next contends that if she is not a joint tenant, she nonetheless had a legal right to one half of the proceeds as a tenant in common. In opposition to her claim, the executor relies on Paragraph 17 of the agreement in which Audrey declared that she would endorse the checks and that all of

the proceeds would belong to Robert. The executor argues that by this provision she gave up whatever legal interest she had in the proceeds.

 While it is true that in the separation agreement Audrey promised to endorse the checks and convey whatever legal interest she retained to Robert, we believe that her covenant to endorse the checks cannot be viewed as independent of Robert's performance of his obligations under the agreement. The checks were payable to "Robert and Audrey Hoffman," and Audrey's endorsement was required before the checks could be negotiated. See *N. J. S. A.* 12A:3–116. In *Woodhouse v. Woodhouse,* 15 *N. J.* 550 (1954) this Court refused to hold a wife to the promises she made in an agreement because the husband failed to perform his promises in the agreement. The property settlement agreement in that case allowed a credit against the husband's support payments to the wife if she received income from any other source. When the husband failed to meet his payments, the wife found it necessary to get a job. We rejected the husband's contention that her employment income should be credited to his support payments, stating that "[s]alutary principles of justice inhibit the enforcement of a promise when the counter-promise has been broken." 15 *N. J.* at 556.

As in *Woodhouse,* in the present case we think that Audrey's promise to endorse the checks was dependent on Robert's performance of his obligations under the agreement, and that the parties would not have intended that Audrey would have been forced to perform when Robert was unable or unwilling to fulfill his own obligations to Audrey and the children.

Although there is no proof in this case establishing to what extent the refund proceeds represent respective overpayments or losses of either spouse, it is clear to us that Robert believed that Audrey's cooperation in filing a joint return would be of considerable value to him. Robert sought to insure that Audrey would cooperate in the filing of the

returns by including a specific provision in the agreement to that effect. It should also be noted that the penalty imposed on Audrey for her failure to perform her covenant in Paragraph 17 to provide information concerning her individual income and deductions was that all provisions for her support and maintenance would be of "no force and effect." The severity of this penalty indicates that Robert viewed Audrey's performance as of significant importance to him. Moreover, the fact that Audrey's cooperation in filing the joint return was expressly linked with her right to support suggests to us that the parties viewed the obligations undertaken by Audrey in Paragraph 17 as connected with Robert's obligations of support and maintenance. Under these circumstances, we think that a fair interpretation of the intent of the parties was that Audrey's performance of her obligations in Paragraph 17 was not a simple formality, and that the parties themselves would not have viewed Audrey's performance as independent of Robert's responsibilities.

If Robert had sought to enforce Audrey's promise in Paragraph 17 while he was alive, he would have had to obtain an equitable order directing her specific performance. But it is well established that one who has either broken a promise in some material respect or is unable substantially to perform his own obligations under an agreement cannot get a decree for specific performance. See 5A *Corbin, Contracts,* § 1175, pp. 301–302, § 1183, p. 339 (1964); 11 *Williston, Contracts,* § 1425, p. 831 (3rd ed. 1968) *Restatement, Contracts* § 373. In view of Robert's failure to perform, we think that equity requires a constructive trust be imposed on the proceeds of the checks. See *D'Ippolito, et al. v. Castoro,* 51 *N. J.* 584 (1968); *Scott, Trusts,* § 462, p. 3413 (3rd ed. 1967). We think it would be unjust to permit Robert's estate to retain the full proceeds of the tax refunds when Robert did not fulfill his promises to Audrey and the children in the separation agreement. The refunds were obtained with the cooperation of Audrey, and we believe she should not be compelled to re-

linquish her interest in the refunds without some protection of the rights she and the children have under the separation agreement.

While we believe that Audrey retained an equitable interest in the proceeds, we also recognize that it is difficult to determine the exact extent of that interest. In light of Robert's illness and his changed financial circumstances, a court of equity could have determined that Robert's obligations in the agreement should have been modified to reflect his ability to pay with consideration for his financial obligations to others. See *Schlemm v. Schlemm,* 31 *N. J.* 557, 580 (1960); *Flicker v. Chenitz,* 55 *N. J. Super.* 273 (App. Div. 1959), appeal dismissed by consent, 30 *N. J.* 152 (1959). Under the circumstances we think the fairest result in order to protect the rights of Audrey and the children with due regard to the interests of the other claimants is to divide the proceeds of the checks according to the legal interests of Audrey and Robert as they appear on the face of the checks. Accordingly, after the satisfaction of the claim of Brooks, we hold that the proceeds of the checks shall be apportioned equally between Audrey and the estate of Robert.

We do not think our result prejudices the justifiable interests of any of the parties entitled to priority under *N. J. S. A.* 3A:24–2. The statute applies only to the property owned by the decedent. Robert would not have been able to realize the proceeds of the refunds unless Audrey performed her obligations, and consequently her equitable interest in those proceeds attached to the fund before it passed into Robert's estate. See *Clapp, 7 New Jersey Practice, Wills and Administration,* § 1280.

We hold that Philip Brooks' fee should be first satisfied from the proceeds of the refund checks. The remainder of the fund should be divided evenly between Audrey and the estate of Robert Hoffman. The estate's share of the proceeds should be distributed in accordance with the order of priority provided in *N. J. S. A.* 3A:24–2, and the case

is remanded to the trial court for further proceedings consistent with this opinion.

WEINTRAUB, C. J. (concurring). I join in the opinion of Mr. Justice Proctor but add some further views, in part in response to the dissenting opinion.

The dissent speaks in terms of the right of "setoff" in the event of insolvency. I think the concept is irrelevant.

Setoff deals with claims arising out of *separate, distinct* transactions. The common law did not recognize the right of a debtor to offset an independent claim he had against his creditor arising out of another transaction. That rule being manifestly unfair, equity intervened to permit the offset, 47 *Am. Jur., Setoff and Counterclaim,* § 10, *pp.* 714–716, and the insolvency of the plaintiff was an occasion for such equitable intervention, 47 *Am. Jur., Setoff and Counterclaim,* § 17, pp. 720–721. Equity required "mutuality" with respect to the claims to satisfy the concept of the justice underlying an equitable right to offset. In that regard, it is usually held that a fiduciary may not offset a demand he has as a nonfiduciary against the beneficiary. The reason for that limitation is readily understandable; a fiduciary should abide by his special trust, and if the beneficiary becomes insolvent, it would be inequitable to permit the fiduciary to gain an advantage over another creditor through the vehicle of a trust obligation he had assumed.

But the issue here is not one of setoff. We are not dealing with claims arising out of distinct transactions. Rather we are dealing with cross-claims under a *single contract.* Technically, the applicable concept is called "recoupment." A recoupment defends against the very claim asserted by a plaintiff, disputing the plaintiff's right to recover some or all of what he demands. It is thus defensive, and, unlike the setoff, recoupment was recognized by the common law. 47 *Am. Jur., Setoff and Counterclaim,* § 9, *pp.* 713–714. To illustrate, if a building contractor seeks to recover

the contract price, the owner who claims the contractor failed to perform or performed improperly may assert a recoupment seeking to defeat or reduce the claim because of nonperformance or poor performance. The owner pursued by or on behalf of the contractor does not resort to the equitable doctrine of "setoff" when he contests the contractor's claim. And of course it would be absurd to say that a creditor of the contractor, or a receiver in the event of the contractor's insolvency, could claim a position better than that of the contractor with respect to the contractor's alleged claim against the owner.

Thus the doctrine of setoff has nothing to do with the case at hand. We have mutual promises in a single contract. The wife agreed to transfer title to the tax refund checks to the husband, and the husband agreed to pay moneys to her for herself and the children. The question is whether equity should order her to transfer title to the checks notwithstanding that her husband was in default in his promises. It would be odd indeed to say she had to turn moneys over to him when moneys were due from him under the same contract. I see nothing to drive a court to that anomalous result. See *Woodhouse v. Woodhouse,* 15 *N. J.* 550 (1954).

The husband bargained for the opportunity to file a joint tax return. As a necessary incident, he gave her a grip upon any refund which might be payable. He did not bargain for a promise that she would transmit the refund even if he should be in default in his dollar obligations to her and the children. It would have been strange to ask her for that covenant and it would be remarkable if she gave it. The natural agreement would be that any asset of his which thus came into her hands would be applied to his broken promise. Yet we are asked to interpolate a covenant that her promise was "independent" of his, to be performed despite his default under the contract. Nothing could be further from her probable intent, or from his. I would not visit upon the wife and children an obligation

so contrary to the demands of fair dealing, an obligation which, as I have said, the husband did not obtain and sensibly could not have sought.

If the husband himself had asked the help of a court of equity to compel her to endorse the check notwithstanding his own default, short shrift would have been made of that application. Sensitive to the justice of the situation, equity would have seen to it that the moneys, thus available, were applied to his performance under the contract. To that end equity would easily conclude she was entitled to claim her share of the legal title to the checks as security for the payment of what was due her.

And if equity would so hold as between the parties to the contract, I am at a loss to understand how a creditor of the husband can claim a different result. It would be novel indeed to alter the terms of a contract at the behest of a creditor. I think it elementary that a creditor, or a representative of creditors in the case of insolvency, stands in the shoes of the party to the contract. If there is no net sum due their debtor, there is nothing for them to take.

I think there is still another ground upon which the wife would be entitled to prevail at least in part. *N. J. S. A.* 3A:24–2 provides for the order in which expenses and debts of a decedent shall be paid and the stated order controls if the estate is insolvent, *N. J. S. A.* 3A:24–37. The fifth category is:

"Judgments entered against the deceased according to the priority of their entries respectively."

The claims which here compete with the wife's are judgments held by other creditors. If the wife holds a "judgment" against the decedent, her judgment is first in time.

I see no reason to say her judgment is not a judgment within the meaning of the statute. A judgment nisi was in fact entered. The agreement negotiated by the parties was incorporated in the judgment and was "hereby approved, subject, however, to the continuing jurisdiction of

this Court to make subsequent award of alimony as the circumstances warrant.' The agreement called for the husband to support the wife and their three children at a stated rate. Among other things, the husband agreed to maintain insurance on his life for the benefit of the children to the extent of $25,000 for each of them.

That a support judgment remains subject to modification upon change in circumstances, N. J. S. A. 2A:34–23, does not militate against the fact that the judgment is a judgment. The record shows a motion was filed on March 10, 1967 to have the husband held in contempt for failing to pay arrears and to compel him to perform the provision with respect to life insurance. The matter was continued because of the husband's illness and on August 30, 1968 the court ordered "that so much of Plaintiff's Motion as seeks to fix the amount of arrears and to adjudge the Defendant in contempt be and the same are hereby denied" but ordered further that the wife is granted leave to serve written interrogatories "upon the Defendant directed to his earnings, income and financial affairs and that the aforesaid matter be and the same is hereby continued without date and until said interrogatories are served and answered." We note that although the court declined to fix the amount of the arrears on that contempt application, the court did not wipe out the arrears or reduce the amount of the support obligation. The husband never sought a modification of the judgment. And of course the judgment was not vacated.

The question arises whether the wife's claim is other than one upon a "judgment" because the amount of the arrears was not fixed. It is important to note what is not involved. The question is not whether arrears must be fixed for other purposes, such as to obtain a writ of execution, or to obtain a lien on real property,[1] or to command

---

[1] When an abstract of a decree nisi was filed with the clerk of the former Supreme Court under section 44 of the Chancery Act of 1902

full faith and credit in another jurisdiction. We are concerned with priorities under a statute controlling the distribution of an insolvent estate, and the question is whether what is undeniably a judgment should be said to be something other than a judgment within the intendment of that statute because the amount of the arrears was not fixed by another order. I see no reason why it should matter whether the arrears were thus fixed.

Nor would I assume the Legislature meant to denigrate a judgment stemming from an obligation to support one's family. The obligation to support one's family should be able to hold its own in this milieu. It perhaps should be mentioned that a bankrupt will not be discharged of his liability "for alimony due or to become due, or for the maintenance or support of wife or child." 11 *U. S. C. A.* § 35(a)(7). See *Wetmore v. Markoe,* 196 *U. S.* 68, 25 S. Ct. 172, 49 *L. Ed.* 390 (1904). This exclusion rests upon a concern for the dependents rather than upon the premise that such dependents ought not to share in the bankrupt's estate. The objective is to leave the bankrupt fully obligated to pay. But when, as in the case at hand, the insolvent estate is that of a decedent, the dependents of course would not be aided by exclusion in the distribution of what remains. Concern for them is expressed by permitting them

(now *N. J. S. A.* 2A:16–18, 19), the installments of alimony became liens on real property as the installments matured. *Stoy v. Stoy,* 41 *N. J. Eq.* 370 (E. & A. 1886) ; *Warren v. Warren,* 92 *N. J. Eq.* 334 (Ch. 1921) ; see annotation, 59 *A. L. R.* 2d 656, 674–675 (1958). Those cases have never been overruled. In *Rooney v. Rooney,* 102 *N. J. L.* 551 (Sup. Ct. 1926), it was held that a lien could not be claimed under a docketed *final* decree for divorce because it did not contain the order for alimony, that order being in the decree nisi which had not been docketed. *Rooney* distinguished *Stoy* and *Warren,* and I assume on that ground, thus accepting their holding that a lien would arise as the installments matured under a docketed decree nisi. In *Joseph Harris & Sons, Inc. v. Van Loan,* 23 *N. J.* 466, 470 (1957), we said that although alimony and maintenance judgments do not "resemble judgments at law in the pecuniary obligations they impose at the time of their pronouncement, * * * they can take on that form as the alimony from time to time accrues," citing *Warren.*

to claim what remains along with other creditors on a basis equal to theirs. To that end a judgment for support should be treated as what it is — a "judgment."

CONFORD, P. J. A. D., Temporarily Assigned (dissenting in part). I agree with the Court's determination of priority in favor of the claim for services of the accountant Brooks. I disagree with the decision of the court that Mrs. Hoffman should take a one-half share of the balance of the tax refund checks. As I see it, that result subverts the letter and intent of the decedents' estates statute giving judgment creditors preference over general creditors in distribution of the estate. N. J. S. A. 3A:24-2.

Preliminarily, a proper disposition of this case requires resolution of whether, apart from the terms of the separation agreement, the tax refund proceeds were beneficially the property of the decedent rather than of Mrs. Hoffman. It has never been claimed by Mrs. Hoffman that the refunds are attributable to payments by her or losses of hers. It is undisputed that decedent paid the taxes; and, as the majority opinion indicates, the proof is that the refunds emanated from amended tax returns filed at the decedent's instance showing previously unclaimed interest deductions and capital losses of the decedent. The estate would seem to be the owner of the refund. See *In re Carson*, 83 *N. J. Super*. 287 (Cty. Ct. 1964). In the absence of any direction by the court for a remand to settle this issue, if there is thought to be any doubt about it, I take it for purposes of the ensuing discussion that the tax refund checks were beneficially the property of the decedent *vis a vis* Mrs. Hoffman.

In view of the foregoing, the agreement by Mrs. Hoffman to endorse any tax refund checks over to decedent was simply in recognition by her of his beneficial entitlement to any such money, and the exaction by him of the covenant by her was to prevent any later nuisance claim in that regard by her. One thing is plain. Decedent's agreement to pay sup-

port money was not the bargained-for equivalent of a surrender by Mrs. Hoffman of any genuine claim of right by her to future tax refunds. It was in recognition of his legal obligation to render support to her enforceable by a court if pursued by her in litigation. The respective separate covenants mentioned were thus independent, not dependent, except to the limited extent expressly made dependent by the language of the agreement itself. The contract authorities cited in the majority opinion are therefore not applicable. *Cf. Woodhouse v. Woodhouse,* 15 *N. J.* 550 (1954).

More to the point, however, is the consideration that where insolvency of a debtor intervenes, and a statute governs the priorities of claims of creditors against an estate, whether that of a decedent or otherwise, the ultimate question of what the estate consists of for purposes of application of such a statute, in relation to cross-claims between the estate and a creditor, is controlled by a well-established body of law not consulted by the majority opinion. Generally, a creditor may set off against a claim by an insolvent or his representative against it any "mutual" claim against the insolvent. See 34 *C. J. S. Executors and Administrators* § 718, pp. 704–705 (1942); *N. J. S. A.* 14A:14–8; Bankruptcy Act, Section 68, 11 *U. S. C. A.* § 108(a); *Clapp, Wills and Administration,* 7 *N. J. Practice* (1962) § 1262, p. 7, nn. 8 and 9; *Nutz v. Murray-Nutz (Appeal of A. W. Crone & Sons),* 109 *N. J. Eq.* 95 (E. & A. 1931); *Receivers v. Paterson Gas Light Company,* 23 *N. J. L.* 283 (Sup. Ct. 1852); *Camden National Bank v. Green,* 45 *N. J. Eq.* 546 (Ch. 1889), aff'd o. b. 46 *N. J. Eq.* 607 (E. & A. 1890). But the present case will be seen not to present an appropriate situation for set-off of mutual claims.

There has been diversity of viewpoint as to what constitutes mutuality of claims, in respect of questions such as whether the claims must arise out of the same transaction or be held or owing between original parties as distinguished from assignees, or the like; see, *e. g.,* 66 *Am. Jur.* 2d "Receivers" § 457, pp. 260–61 (1973); *Receivers v. Paterson*

*Gas Light Company, supra; Harris v. White,* 5 *N. J. L.* 422 (Sup. Ct. 1819). Such problems, however, do not concern us here. What does here matter is that it is thoroughly settled that the rule of set-off does not apply where the obligation *to* the insolvent estate is one of trust, *quasi*-trust or constructive trust in relation to a specific fund or property beneficially belonging to the insolvent, and therefore to his or its representative. In such a case the trust obligor cannot set off against his obligation to perform his duty to the *cestui que trust* a money obligation due from the insolvent to him. The "claims" are not "mutual." *Morris v. Windsor Trust Co.,* 213 *N. Y.* 27, 106 *N. E.* 753 (Ct. App. 1914); *In re Consolidated Indemnity & Insurance Co.,* 287 *N. Y.* 34, 38 *N. E.* 2d 119 (Ct. App. 1941); *Rothstein v. Autorist A/S,* 37 *Misc.* 2d 683, 236 *N. Y. S.* 2d 337 (Sup. Ct., N. Y. Co. 1963), aff'd o. b. 18 A D. 2d 1140, 239 *N. Y. S.* 2d 653 (Sup. Ct., App. Div. 1963); *Perring v. Baltimore Trust Corporation,* 171 *Md.* 618, 190 *A.* 516 (Ct. App. 1937); *Fore Improvement Corporation v. Selig,* 278 *F.* 2d 143 (2 Cir. 1960); *In re Autler,* 23 *F. Supp.* 756 (S. D. N. Y. 1938); *Brust v. Sturr,* 128 *F. Supp.* 188 (S. D. N. Y. 1955), modified on other grounds 237 *F.* 2d 135 (2 Cir. 1956).

The implicit salutary rationale of the rule last stated is apparent. A creditor cannot be allowed indirectly to improve his priority status as against other creditors of an insolvent estate by disguising a separate fiduciary obligation on his part as a "mutual" claim of the insolvent subject to set-off by him. The rule fits the facts here like a glove. On the factual assumption made above, the tax-refund checks were the property of the decedent, and Mrs. Hoffman was, entirely independently of the separation agreement, a *quasi*-trustee of them for decedent's benefit. Were this a case where the husband or the estate was solvent, and a court was confronted solely with a default in support by him and a refusal to indorse the checks by her, a different situation would be presented and the result might well differ. But

here an insolvency and claims by judgment creditors have intervened; the issue is not merely what constitutes equity as between contesting divorced wife and husband, but rather what is the correct adjustment, in the light of the decedents' estates statute, of the competing claims of the wife and the judgment creditors over this fund — indubitably property of the estate. The statute resolves that issue in favor of the judgment creditors. The courts must respect the statute.

If Mrs. Hoffman would have been regarded as a *quasi*-trustee of the fund for the estate in the absence of her covenant in the separation agreement, as she clearly would, she surely cannot qualify her fiduciary obligation in that regard merely because she affirmatively covenanted in the agreement to turn over the money.

It may further be noted that it seems arbitrary, in any event, to award Mrs. Hoffman half the balance of the fund. No one knows as yet what the Chancery Division would have allowed her on the support claim, having regard to the changed circumstances of the decedent after the divorce. Moreover, as the majority recognizes, she has not established a beneficial right in the money as either a joint tenant or a tenant in common. The logic of the court's opinion as to dependent promises, if accepted at all, would permit at most a remand for the determination of the amount of the support claim as of decedent's death, and allowance of that only. Allowance of one-half of the balance of the tax refund is arbitrary.

In reference to the added ground of decision proffered by the concurring opinion that the original judgment of divorce was a "judgment" within the "judgment creditor" priority established by *N. J. S. A.* 3A:24–2, this is contrary to the concession by appellant and in flat discord with existing law. In *Madden v. Madden,* 136 *N. J. Eq.* 132, 136 (E. & A. 1945), the highest court said: "In this state arrearages of alimony do not become vested in the former wife or *take on the attributes of a judgment for the payment of a fixed sum* until [the] court so orders. No such order was made in

this case." (Emphasis added.) The rule is based on the principle that arrearages are always subject to judicial revision retroactively as circumstances may justly require. 10 *N. J. Practice, Marriage, Divorce & Separation* (Herr-Lodge 3d ed. 1963) § 650, p. 570; *Slep v. Slep,* 43 *N. J. Super.* 538, 542 (Ch. 1957). These precepts were in effect at all times here involved. See *Tancredi v. Tancredi,* 101 *N. J. Super.* 259, 262–263 (App. Div. 1968). See also footnote 1, *infra.*

Reflection upon the purpose and intent of *N. J. S. A.* 3A:24–2, in the light of the foregoing, persuades that the view of the concurrence is incompatible with the statute. The latter contemplates that as a matter of policy a claim of whatever nature reduced to a money judgment as of a fixed date should have priority as against other money judgments entered later and as against all claims regardless of antecedence in origin if not fixed in a pecuniary adjudication. Such a rule permits the representative of the estate by a search of the records to know with certainty how to distribute the estate as between judgment creditors and others.[1]

---

[1] The cases cited in footnote 1 of the concurring opinion, taken collectively, do not establish present law to be, as there implied, that unadjudicated arrearages of alimony automatically become judgment liens as they accrue. Indeed, *Joseph Harris & Sons, Inc. v. Van Loan,* 23 *N. J.* 466 (1957), apart from the enigmatic *dictum* therein quoted in the concurrence, not only holds that unadjudicated alimony arrearages do not constitute a judgment upon which execution can issue (at 471) but it also deliberately declares, and says such has been New Jersey law for a century (at 471), that it requires the fixing of such arrearages in a stated amount by judgment, and the entry of that judgment in the civil docket, to constitute the arrearages a lien (at 472). The holding in *Rooney v. Rooney,* 102 *N. J. L.* 551 (Sup. Ct. 1926), was precisely to the same effect, and this has always since been regarded as the law. See *Welser v. Welser,* 54 *N. J. Super.* 555, 562–563 (App. Div. 1959) (per Schettino, J. A. D., later Justice of this Court) ; Hartman, "Domestic Relations", 16 *Rutgers L. Rev.* 261, 272, 273 (1962). *Welser* cites with approval (54 *N. J. Super.* at 561) the well-reasoned holding in *Duffy v. Duffy,* 19 *N. J. Misc.* 332, 19 *A.* 2d 236 (Ch. 1941), directly in point on the instant issue,

It is not for the courts to quarrel with the legislative policy decision so long as that decision is reasonably clear — as here I think it is. The statute is neutral in respect of the relationship of the creditor to the insolvent decedent — be it a wife claiming alimony or former employees claiming breach of contract under a retirement plan (as apparently the case as to one of the judgments here). If the intent of the concurring opinion is that the unadjudicated arrearages calculated down to the date of insolvent's death, *nunc pro tunc* as of the date of the support order in 1965, are to be considered a judgment in that amount and on that date for purposes of *N. J. S. A.* 3A:24–2, the statutory priority policy is obviously subverted. If the intent of that opinion is, rather, to set priorities in amounts due, and as of dates when, petitions to fix arrearages were filed, there is still conflict with the statutory purpose and object — but also, no attempt in the opinion to compare such amounts and dates with those of the three contesting judgments in order to settle out the priorities. Moreover, either hypothesized version of the concurrence conflicts with the theory of the result in the majority opinion, in which the concurrence joins, awarding a flat one-half of the balance of the fund to the wife.

I would affirm the judgment of the Appellate Division as modified to allow the claim of Brooks.

Justice Mountain joins in this partly dissenting opinion.

that a wife has no vested right to unadjudicated arrears of alimony under a separation decree against the executors of her deceased husband.

The obscure *dictum* to the contrary in *Warren v. Warren*, 92 *N. J. Eq.* 334, 336 (Ch. 1921), cited in the concurrence, has never been followed; it plainly misread Section 44 of the old Chancery Act (Comp. Stat. 1910, p. 425; now *N. J. S.* 2A:16–18; 19; 20); and the express declaration in *Joseph Harris & Sons, Inc., supra*, mentioned above (23 *N. J.* at 472), of course has the effect of overruling it.

94 

*For reversal and remandment* — Chief Justice WEIN-TRAUB and Justices JACOBS, PROCTOR, HALL and SULLIVAN —5.

*For affirmance in part* — Justice MOUNTAIN and Judge CONFORD—2.