**George BSALES, Robert DeTitta, Raymond Jordan, James Kelly, Martin Mundy, Robert Romo, Robert Stone, Joseph Travaglio and John Valenta, Plaintiffs,**

v.

**TEXACO, INC., Albert Shotmeyer and Henry Shotmeyer, Defendants.**

**Civ. A. No. 80–3063.**

United States District Court, D. New Jersey.

June 17, 1981.

Lowen & Abut, P. A., Fort Lee, N. J., for plaintiffs by Charles C. Abut, Fort Lee, N. J.

Jeffer, Hopkinson & Vogel, Hawthorne, N. J., for defendants Albert Shotmeyer and Henry Shotmeyer by Jerome A. Vogel, Hawthorne, N. J.

Carpenter, Bennett & Morrissey, Newark, N. J., for defendant Texaco, Inc. by Michael S. Waters, Newark, N. J.

## OPINION

SAROKIN, District Judge.

The nine plaintiffs in this action are franchised gasoline station dealers, pursuant to lease and dealer agreements executed with defendant Texaco, Inc. Each of the stations is located on property owned by the defendants Albert and Henry Shotmeyer, or companies controlled by one or both of them ("Shotmeyers"). Texaco leases the properties from the Shotmeyers, and in turn subleases them to the individual plaintiffs. Plaintiffs instituted this action on September 18, 1980, after receiving notice from Texaco that each of the franchises was to be deemed terminated effective October 14, 1980.

The complaint alleges violations of the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. § 2801 *et seq.*, the existence of a tortious conspiracy between Texaco and the Shotmeyers to deprive plaintiffs of their business premises, breach of express and implied contract, promissory estoppel, and other legal theories. Currently pending before the court are motions for summary judgment, filed by each party to the suit.

## I. BACKGROUND

In October of 1960, defendant Texaco leased twenty-two parcels of service station properties from the Shotmeyers, including the ten involved in this litigation. Each of the ten properties was the subject of a separate lease agreement between the Shotmeyers and Texaco for a term of twenty years. The leases were scheduled to terminate on or about October 14, 1980. Each lease, however, contained an option to Texaco to extend the lease for one additional period of five years. The rent for such five-year period was not agreed upon in the original lease. Rather, rent was to be established by negotiation or by a percentage of the appraised value of the premises determined by arbitration. If Texaco sought to exercise the option, it was required to

provide the Shotmeyers with 12 months' prior notice in writing.[1]

Texaco subleased the properties to the plaintiffs. As part of their arrangement with Texaco, each plaintiff executed a sublease for the property and an agreement concerning the purchase and resale of Texaco products. Each sublease provided that if Texaco was holding the property by lease from a third party, it was under no obligation to renew its own tenancy. Each sublease also provided that

"... lessor ... shall be under no obligation to exercise any option it may have to renew or extend the term of any lease under which it holds or may hold said premises ..."

Affidavit of Michael J. Hogan, Exhibits 1, 4, 7, 10, 13, 16, 20, 23, 26, and 29.

Beginning sometime in late 1978, Texaco began to review the twenty-two separate parcels of service station properties it had leased from the Shotmeyers. The leases on said properties were due to expire on October 14, 1980. Between 1978 and 1980, Texaco and the Shotmeyers negotiated renewal terms and conditions. Unable or unwilling to come to terms, Texaco notified plaintiffs in June 1980 that it would no longer have an interest in the subject properties beyond October 14, 1980, and that their franchises could not be renewed. Notice of nonrenewal was sent to each plaintiff by certified mail on June 25, 1980.

Plaintiffs allege that the negotiations between Texaco and the Shotmeyers were not carried out in good faith, and were the result of "a concerted and wrongful effort to extricate themselves from contractual obligations." Plaintiffs' Brief in Opposition to Defendants Shotmeyers' Motion for Summary Judgment at 9.

In addition to the claim that the defendants did not bargain in good faith with each other, the plaintiffs contend that during the several years preceding expiration of the master leases, they received assurances from representatives of both Texaco and the Shotmeyers to the effect that they would be permitted to remain in possession of the premises past October 14, 1980. Because plaintiffs' action rests so heavily upon the alleged assurances received from the defendants, said assurances are set out in full, as sworn to by each plaintiff:

1. *Plaintiff George Bsales* signed a lease agreement with Texaco covering the period October 1, 1977 to September 30, 1980. When he signed the lease agreement, he was informed by a representative of Texaco that Texaco had a twenty-year lease on the property due to expire in 1980, that Texaco had an option to renew its lease, that Texaco would exercise that option, and that Bsales would be able to continue occupying the premises past 1980.

Bsales claims that during 1979, the same Texaco representative offered him a new written lease extending past 1980, and that discussions were held concerning the method of rental calculation and the amount of the proposed rental increases. Bsales was told that he would have a chance to review the proposed lease "later on", and admits that he never actually saw a written lease agreement. He was assured, however, that his occupancy of the premises would not be endangered.

---

1. The option clause reads as follows:

"The option is hereby granted to Tenant to extend this lease for one additional period of five years at an annual rental of an amount equal to 8 per cent of the appraised value of initial term as agreed upon by the parties or, if the parties cannot agree thereon, as determined by arbitration in the same manner as in Section 12.03 hereof provided for determination by arbitration of the rental to be paid by Tenant subsequent to any partial taking of the Demised Premises in eminent domain which does not result in termination of this lease by Tenant, but in no event less than the annual rental which was paid by Tenant during the last year of the initial term, and upon the terms (other than duration, extension option and annual rental) herein specified, provided, however, there be no default hereunder at the end of the initial term hereof. The option to extend the term hereof hereby granted Tenant shall be exercised by at least 12 months' prior written notice delivered to Landlord in the manner provided in Article Twenty-two hereof."

Reply Affidavit of Albert Shotmeyer, ¶ 6.

Bsales further claims that he had communications with Paul Tiger, general manager of the defendant Shotmeyer. Tiger visited Bsales at his service station in late 1979 and confirmed that Texaco and Shotmeyer were negotiating for a five-year renewal. In March 1980, Tiger again visited Bsales and told him that although Texaco and Shotmeyer had not reached a firm agreement, Bsales need not worry because he could obtain a lease directly from Shotmeyer. Tiger offered a direct lease for a trial six-month period at a rental of $1200.00 per month. Bsales claims to have accepted these terms, and was awaiting a formal written agreement.

Finally, Bsales called Tiger after receiving the notice of nonrenewal from Texaco. Tiger assured him that he had nothing to worry about and that the franchise would be fully protected.

2. *Plaintiff Robert DeTitta* entered into a new lease on his service station property in December 1978. He was aware of the master lease and of Texaco's option to renew. He was led to believe that Texaco would exercise its option.

During 1979, DeTitta was visited by a Texaco representative and was shown a new lease agreement for his premises. He was told that if he signed the new lease, he would be able to remain in possession of the premises through 1982.

Sometime in 1980, DeTitta claims that he indicated to Mr. Tiger, the Shotmeyer representative, that he was aware of the new rent structure proposed by Shotmeyer to Texaco. After receiving the notice of nonrenewal from Texaco, DeTitta was again visited by Tiger. DeTitta was asked to fill in a financial statement, and was told that there would be no problem in his continuing in possession. He was informed that he would remain in business with either Texaco or Shotmeyer supplying the gasoline.

3. *Plaintiff Raymond Jordan* claims to have received information and assurances from Texaco representatives similar to that received by Bsales and DeTitta. In addition, Jordan claims to have negotiated over a period of time with a Texaco representative about a new lease agreement.

Jordan also had direct dealings with Tiger, who asked Jordan whether he would be interested in leasing directly from Shotmeyer at a rent of $1000.00 to $1200.00 per month. Jordan told Tiger that he accepted the proposal and looked forward to signing a formal lease agreement. Jordan subsequently asked Tiger when the new lease would be signed, and Tiger said that he would get back to him. Jordan claims that throughout his dealings with Tiger, he was assured that if Texaco did not renew its option, he would deal directly with Shotmeyer.

4. *Plaintiff James Kelly* received similar assurance and information from Texaco representatives. He claims that he was offered a new lease agreement from Texaco in 1979 and that he agreed to sign it. He was not, however, given an opportunity to sign the document.

After receiving the notice of nonrenewal from Texaco, Kelly called Robert Olum, a representative of Albert Shotmeyer. He was told not to worry, that Shotmeyer would negotiate with him, and that his situation would be protected. He was told that his occupancy of the property would not be jeopardized, and that the only possible change would be that Shotmeyer and not Texaco would become his supplier.

5. *Plaintiff Martin· Mundy* concedes knowledge of the master lease and the option to renew. He was presented with a new lease by a Texaco representative during 1979. After discussions about the increases in rent, Mundy was assured that the proposal would be available in 1980.

Mundy claims that a representative of the Shotmeyers advised Mundy in 1980 that he would have the opportunity to negotiate directly with the Shotmeyers, and that there would be no problem in his occupying the premises past October 1980.

6. *Plaintiff Robert Romo* claims to have actually signed a new lease with Texaco in 1979, to take effect in 1980. At that time, he was informed that Texaco was in the process of negotiating renewal of its master

lease with the landlord of the premises. He was assured that there would be no problem with Texaco's renewal. Romo was subsequently informed on several occasions by Texaco that negotiations were continuing and that there would be no problem with his continued occupancy.

According to Romo, he reached an oral agreement in 1980 with Tiger, Shotmeyer's representative, as to a lease arrangement. He was told that a lease could be signed in early September. When Tiger did not appear, Romo called him and was informed by Tiger that the matter was out of his hands. Nevertheless, according to Romo, he was assured by Tiger that business would continue as normal, and that an agreement would be reached.

7. *Plaintiff Robert Stone* received information from Texaco about the underlying lease, assurances of continued occupancy, and a new lease proposal for his premises. As to the new lease proposal, Stone negotiated over a period of time with a Texaco representative as to the rent.

8. *Plaintiff Joseph Travaglio* received similar assurances and information from Texaco. He claims that he was told by a Texaco representative that the notice of nonrenewal was a "form letter", and that the situation was going to be dealt with. Travaglio's attorney was informed by Texaco on July 16, 1980 that negotiations with Shotmeyer were at a standstill.

His attorney then negotiated directly with Shotmeyer. At one point, a note was left by Tiger to the effect that Travaglia could lease from Shotmeyer at $1200.00 per month, with one month's rent and one month's security being deposited. Shotmeyer's attorney confirmed that Shotmeyer was willing to lease to Travaglia at that amount. He claims that he was always assured that he would be able to continue in business.

9. *Plaintiff John Valenta* has two service stations. As to each property, Valenta claims to have signed extensions of his leases with Texaco permitting occupancy of the premises past October 1980. He was advised that Texaco would also sign the leases and that he had nothing to worry about.

In March 1980, Valenta met with Shotmeyer, who advised him that Texaco might not renew its lease agreement. Discussions took place concerning a direct relationship between Valenta and Shotmeyer. In April 1980, the two met again and had a detailed discussion of terms to allow Valenta to continue operating his service station. According to Valenta, Shotmeyer led him to believe that he would be able to continue in possession of his business premises past October 1980. Valenta claims to have had at least three other meetings, similar in substance, with Shotmeyer.

Not surprisingly, the defendants dispute much of what is contained in plaintiffs' affidavits. According to Texaco, it was seeking to secure favorable lease renewal terms. Texaco claims to have negotiated in good faith with the Shotmeyers throughout 1979 and 1980, but decided ultimately that the terms insisted upon by the Shotmeyers were unacceptable. Texaco admits that it approached the plaintiffs with proposed leases, but claims that it did so in order to afford Texaco a basis for its negotiations with the Shotmeyers. Texaco insists that each plaintiff was informed that renewal was dependent upon Texaco renewing its own lease with the Shotmeyers.

The Shotmeyer defendants admit to having had discussions, mostly through representatives, with some of the plaintiffs. They claim, however, that any discussions were at most tentative, and that they had no knowledge of on-going negotiations between Texaco and the plaintiffs.

Additional facts will be referred to where appropriate to the legal discussion.

## II. DISCUSSION

Each of the parties has moved for summary judgment pursuant to Fed.R.Civ.P. 56(c). Upon a motion for summary judgment, the court must determine whether there are genuine issues of fact to be tried. Inferences from the underlying facts must be drawn in favor of the party against whom summary judgment is sought, *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d

Cir. 1978), and summary judgment should be granted only if it appears "that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A. Defendants Shotmeyers' Motion for Summary Judgment on the PMPA Claims.

The Shotmeyers have moved for summary judgment on the grounds that (1) the PMPA has *no application to them and im*-posed upon them no obligations enforceable by the plaintiffs, and (2) that there is no evidence supporting an inference that the Shotmeyers tortiously conspired with Texaco to terminate the plaintiffs' use and occupancy of their business premises.

■ *Congress in enacting the PMPA was* concerned with the disparity of bargaining power between distributors and retailers of motor fuel. Because of this disparity, Congress sought to limit the circumstances in which a distributor could terminate a franchise relationship with a retailer. Before the provisions of the statute can be applied, however, it is necessary that a franchise relationship exist between the parties.

The terms "franchise", "franchisor" and "franchise relationship" are defined in the act.[2] In order to have a franchise, there must be a contract between the parties, and that contract must pertain to the sale or distribution of motor fuel. In addition, in order for a party to be a "franchisor", that party must be

"a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel."

15 U.S.C. § 2801(3).

■ Given these definitions, the Shotmeyers do not come within the literal scope of the act. Nevertheless, the legislative history of the PMPA indicates that in an extraordinary situation, a landlord of premises used in a franchise operation may owe certain duties to the franchisee, even though the landlord is not a franchisor.

■ The act provides that a franchisor may terminate a franchise relationship if the franchisor's right to lease the marketing premises has expired. 15 U.S.C. § 2802(c)(4). This section was interpreted in the Senate Report as follows:

"Expiration of the lease could occur in a variety of circumstances including, for example, a decision by the franchisor not to exercise an option to renew the underlying lease. However, *it is not intended that termination or non-renewal should be permitted based upon the expiration of a lease which does not evidence the existence of an arm's length relationship between the parties.*"

Senate Report 95–297, 95th Congress, 2d Session, *reprinted in* [1978] U.S.Code Cong. and Ad.News 877, 896 (emphasis added). Thus, if the landlord and the franchisor enter into a lease which is not the product of arm's length negotiations and that lease expires and is not renewed, then the franchisee may have a cause of action against both the franchisor and the landlord. Similarly, the absence of an arm's-length relationship between the franchisor and the landlord at the time that an option to renew a lease is under consideration might give the franchisee rights against both parties, if the option is not exercised.

Such an interpretation of the statute would give strength to the restrictions placed by Congress upon a franchisor's right to terminate a franchise relationship. The reach of the statute and the remedies it provides could not be avoided by a lease agreement between the franchisor and a "landlord" under the control of the franchisor.

Plaintiffs argue that during the negotiations concerning renewal of the master leases, there was less than an arm's-length relationship between Texaco and the Shotmeyers. First, plaintiffs contend that the alleged conspiracy between Texaco and the Shotmeyers raises, at the least, a question of fact as to whether the relationship was

2. 15 U.S.C. §§ 2801(1), (2) and (3).

arm's-length. As a corollary to the conspiracy argument, plaintiffs also contend that the Shotmeyers might be seen as agents of Texaco:

> "the actions of the Shotmeyers in failing to renew the plaintiffs' leases, may be seen as part of an agency relationship, if the Shotmeyers' failure to renew was predicated on a desire to carry out Texaco's wishes, or on a subtly disguised 'agreement to disagree.' On this rationale, the Shotmeyers may be held liable under the Petroleum Marketing Practices Act on the basis of *respondeat superior.*"

Brief for Plaintiffs in Opposition to Defendants Shotmeyers' Motion for Summary Judgment at 13.

■ There is no evidence, however, that Texaco exercised any control over the Shotmeyers in 1960 when the master leases were executed. Nor is there any evidence that Texaco in any way directed or controlled the Shotmeyers' decision not to renew the leases in 1979 and 1980, or that the defendants have entered into a conspiracy.[3] Therefore, the plaintiffs cannot rely upon the narrow exception to the general rule that a contractual relationship between the parties is a precondition to invocation of the PMPA.

The plaintiffs have offered another, and rather creative, argument for bringing a claim against the Shotmeyers under the PMPA. They contend that the PMPA is based upon theories of tort law, and insofar as the Shotmeyers acted in concert with Texaco, they can be held as joint tort-feasors. As such, plaintiffs contend that the Shotmeyers may be liable for violations of the PMPA.

Classification of the PMPA as one of tort or one of contract, however, does not address the issue directly. The statute sets forth certain conditions relating to franchise relationships and remedies available for wrongful action. Whether the basis for the duties imposed upon franchisors sounds in tort or in contract, the statute is clear about the parties affected. As discussed earlier, the statute generally reaches only those persons in franchise relationships. Its coverage does not extend to third parties such as the Shotmeyers.[4]

For these reasons, the court finds that the Shotmeyers are entitled to judgment as a matter of law on the PMPA claims.

**B. Defendants Shotmeyers' Motion for Summary Judgment on the Claims of Conspiracy.**

■ Paragraph 40 of the Verified Complaint alleges that "the Shotmeyer defendants and defendant Texaco have entered into a conspiracy to deprive the plaintiffs of the use of the premises which they presently occupy." The plaintiffs concede an inability "to produce direct and explicit evidence of such a conspiracy", and seek to establish its existence inferentially.[5] Brief for Plaintiffs at 5–6. The Shotmeyers contend that there is no evidence supporting an inference of conspiracy, and that, therefore, they are entitled to summary judgment.[6]

---

**3.** The conspiracy argument is considered more fully below.

**4.** The PMPA, if it is to be classified, belongs most properly to the law of contracts. It is based upon the unequal bargaining positions of the parties to a franchise, and it operates exclusively upon that contractual relationship. Moreover, much like the Uniform Commercial Code, it establishes boundaries on permissible commercial activity within a particular context.

**5.** Eight of the plaintiffs also conceded, at depositions, of having no knowledge of facts to support a claim of conspiracy.

**6.** Having dismissed the PMPA claims against the Shotmeyers, the court no longer has an independent basis of subject matter jurisdiction to entertain plaintiffs' state law claims against the Shotmeyers. Although there are limitations on the court's power to entertain state claims after dismissal of a federal claim, *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and limitations on the court's power to exercise "pendent party" jurisdiction, *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), this case presents a jurisdictional problem the resolution of which rests in the sound discretion of the court. The court finds that dismissal of the state law claims at this point in the proceedings would be unfair and inconvenient to all parties to the action.

■ Plaintiffs claim that a conspiracy can be established

"by the obvious implications of what actually occurred. Briefly stated, the Shotmeyer defendants sought to protect their own interests, and defendant Texaco did the same thing: the result was a tacit agreement that each of the parties would walk away from the negotiation table, with the knowledge that the only persons harmed would be the plaintiffs."

Plaintiffs' Brief at 6. Assuming that the defendants recognized that their failure to reach terms on a renewal of the master lease would cause harm to the plaintiffs, this knowledge does not permit an inference of conspiracy. Further, the allegation that the defendants negotiated with their own best interests in mind does little to advance plaintiffs' cause. Indeed, there is no allegation that the defendants acted with the intention of harming plaintiffs, nor is there an allegation that they acted collusively for anticompetitive purposes. All that the evidence demonstrates is that the Shotmeyers took a firm position at the bargaining table with Texaco.

■ Moreover, even if it could be inferred that the Shotmeyers were making unreasonable demands and were bargaining in bad faith, such behavior would not be actionable. The Shotmeyers in their negotiations with Texaco owed no duty to these plaintiffs. They had the right not to bargain at all. Their stance during these negotiations with Texaco, no matter how arbitrary, does not create a cause of action.[7]

Plaintiffs have come forth with no evidence to withstand summary judgment. In the Verified Complaint, plaintiffs allege the following as evidence of conspiracy:

"(A) The repeated written and oral representations of the defendants that the plaintiffs would, in fact, continue their franchise relationship well past 1980;

(B) The execution by plaintiffs of proposed new leases offered by defendant Texaco, extending past 1980;

(C) The subsequent refusal of all defendants to deliver to the plaintiffs, or their representatives, copies of the master lease agreement among the defendants, and/or copies of the five year option, despite repeated request and inquiry;

(D) The continuing refusal of the Shotmeyer defendants to negotiate a renewal with respect to the plaintiffs' occupancy of the premises in question;

(E) The fact that the Shotmeyer defendants seek to take advantage of the termination of the plaintiffs' franchise relationship by themselves taking over the properties, for the purpose of furthering their own competing gasoline retail business."

Verified Complaint, ¶ 41. None of these allegations, however, tends to establish the existence of a tortious agreement between the Shotmeyers and Texaco. Because the plaintiffs have submitted no evidence from which a conspiracy could be reasonably inferred, the defendants' motion for summary judgment is granted.[8]

C. Remaining Claims Against the Shotmeyers and Right to a Continuance of Preliminary Injunction.

Plaintiffs also allege causes of action based upon fraud, misrepresentation, promissory estoppel, quasi contract and tortious interference with prospective economic ad-

---

**7.** Plaintiffs allege that as subtenants, they have certain enforceable rights as against the landlords. Those rights, however, do not go so far as to cover negotiations between the landlord and the tenant on the master lease.

**8.** Plaintiffs contend that summary judgment is improper in light of the Shotmeyers' failure to comply with discovery orders and to turn over information which would assist plaintiffs in demonstrating the existence of a conspiracy. The only information which plaintiffs have not received is the content of certain appraisals done by the defendants on the subject properties. Plaintiffs argue that the appraisals formed the basis for negotiations with Texaco in 1979, and might thus be used to demonstrate bad faith. The court finds, however, that this information would add nothing to plaintiffs' claim of conspiracy. At most, it would demonstrate that the Shotmeyers did not bargain in good faith. Such conduct, as indicated earlier, would not be actionable.

vantage. The Shotmeyers have not expressly moved for summary judgment on these claims.

The court, however, is concerned that these causes of action might not be viable. Taking the facts as presented by plaintiffs, there is a question as to whether the representations made by the defendants are actionable under any of the above-mentioned theories. In addition, some of the theories require proof of actual reliance. As yet, the plaintiffs have done no more than baldly assert that

> "the defendants' promises were conveyed to the plaintiffs with the clear expectation that the plaintiffs would rely thereon. In fact, *they did reasonably rely on those promises.*"

Brief for Plaintiffs in Support of Application for Preliminary Injunction at 21.

■ None of the remaining theories advanced by plaintiffs, however, supports a remedy which would permit plaintiffs to remain in the business premises. Even if the representations by the Shotmeyers are actionable, the remedy for such misrepresentations is damages. Similarly, if the action is based upon promissory estoppel or quasi-contract, the plaintiffs are not entitled to specific performance. No plaintiff ever reached an agreement with the Shotmeyers as to the terms and conditions of a lease arrangement. Even if one of the plaintiffs unconditionally accepted the terms offered by one of the Shotmeyers, he would not be able to prove the agreement with sufficient specificity to permit enforcement. *D. H. Overmyer Co. v. Brown*, 439 F.2d 926 (10th Cir. 1971); *Ginsburg v. White*, 139 N.J.Eq. 271, 50 A.2d 644 (E. & A.1947). The rent, term, tax obligation, insurance requirements, etc. of any offer or agreement have not been established, and cannot be established, by the plaintiffs. Furthermore, no plaintiff has indicated that he is ready, willing and able to perform under the terms and conditions allegedly proffered by defendants. *In re Estate of Hoffman*, 63 N.J. 69, 304 A.2d 721 (1973); *Korb v. Spray Beach Hotel Co.*, 24 N.J.Super. 151, 93 A.2d 578 (App.Div.1952). To

the contrary, plaintiffs reserve the right to accept or reject such proposals if there is a determination that such representations have been made. It is for these reasons that the court could not permit the continuation of the preliminary injunction as against the landlords. The plaintiffs' exclusive remedy for the wrongs they allege is damages. Therefore, as indicated in the court's letter of May 12, 1981, the preliminary injunction is vacated.

## CONCLUSION

One cannot consider the plight of the plaintiffs without sympathy for their predicament. They have been operating their respective stations for many years at a given location. Relocation offers little or no opportunity to retain present customers unless a site is available within close proximity.

But such risk was not unforeseen when the original agreements were reached. The underlying lease was subject to termination and with it, the subleases. When Texaco could not reach agreement with the Shotmeyers, efforts were made by plaintiffs to negotiate directly with the Shotmeyers. Those negotiations were not consummated. No written leases were executed. N.J.Stat. Ann. § 25:1–1 (West).

Plaintiffs' contention that the landlord assured them of an extension cannot create a lease where none exists. The parties did not come to terms. A court cannot impose terms upon a landlord which he has not agreed to accept. Nor can a court require a landlord to be reasonable in fixing such terms.

■ The vague assurance that an agreement will be reached creates no estoppel under the facts of this case. The promise is vague and there is no evidence of any substantial reliance thereon. Had the promises not been made, what would plaintiffs have done differently? They would have been required to vacate the premises and relocate. They are in that identical posture at this moment. There is no evidence that any plaintiff made substantial improvements or otherwise acted in reliance on the alleged

misrepresentations to his detriment. In the absence of such reliance or a firm enforceable lease, plaintiffs cannot insist upon continued possession of the demised premises. Despite the adverse consequences of such a ruling, this court cannot create a tenancy where none exists, or fix its terms where none are agreed.

The policy of the PMPA does not extend so far as to impose upon a landlord who is not a franchisor the obligation to continue a franchisee in possession of premises where the landlord has entered into no such agreement. The landlord in each of said leases subjected himself to an extended term upon the exercise of an agreed-upon option. Once that option was not exercised, the Shotmeyers' obligation ceased and with it the obligation to the plaintiffs, the subtenants. Plaintiffs *may* have a cause of action against Texaco for its failure to exercise said option, but not against the Shotmeyers by reason of such failure.

The motions of the Shotmeyer defendants for summary judgment are granted.