**Georges M. JABBOUR, et al., Appellants,**

v.

**Bahaeddine BASSATNE, et al., Appellees.**

**Nos. 95–CV–138, 95–CV–263, 95–CV–1296.**

District of Columbia Court of Appeals.

Argued Feb. 27, 1996.

Decided March 28, 1996.

John V. Esposito, Washington, DC, for appellants.

Allen P. Waxman, with whom Douglas R. Marvin and Stephen D. Sencer, Washington, DC, were on the brief, for appellees.

Before STEADMAN, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge:

These appeals are from the grant of summary judgment to appellee (Bassatne[1]) on a suit by appellant (Jabbour) for specific performance of a settlement agreement between the parties; and from the award of substantial attorney's fees against appellant as a sanction under Super.Ct.Civ.R. 11 (1995). The trial court concluded as a matter of law that Jabbour was not entitled to specific performance because he had not furnished a real estate appraisal as required (and defined) by the agreement. The court further determined that Jabbour's counsel had filed the lawsuit based on representations by Jabbour as to his compliance with the agreement which Jabbour knew to be false. We affirm.

## I.

Partly to settle a lawsuit Bassatne had filed against Jabbour in the Bahamas alleging fraud, the parties entered into a settlement agreement in 1993 whereby Jabbour, in return for dismissal of the suit and other considerations, agreed to pay Bassatne $3,450,000 in cash or, at his election, in the form of "certain parcels of land in Coral Harbour [in the Bahamas], with a value equivalent to the agreed upon $3,450,000." Jabbour elected the latter form of payment. In that event the agreement required each party to obtain an appraisal of the land on a "per acre, market value basis." It then provided that if the appraisals varied by less than 15%, they would be averaged; but if they varied by more than 15%, a third appraisal would be obtained and the three averaged to arrive at the value of the land. Clause Six of the agreement specified that if Jabbour failed "to comply with any of the terms of this Agreement," the agreement would be of no legal effect.

The Coral Harbour land was undeveloped, a fact reflected, though not with perfect clarity, in the "LIMITING CONDITIONS" contained in the appraisal submitted by Jabbour:

This appraisal is made based on assumed "permitted use" of the property. The opinion of value is an estimate of the current market value in a developable condition. *The estimate of value gives no consideration to any additional cost, if needed, for land preparation.* [Emphasis added.]

The appraisal report also noted that certain areas of the property were underwater and "assume[d]" their suitability for development "once sufficient fill has been brought in the place on the property." The appraisal made "no compensation for the expense of filling these wetlands." Throughout these proceedings, Jabbour has not disputed that the appraisal made no allowance for the cost of developing the land. Jabbour's appraisal nonetheless valued the land at $37,540,000, some $33 million more than the appraisal submitted by Bassatne.

After the Jabbour appraisal was prepared but before it was submitted to Bassatne, Jabbour sued for specific performance in the Superior Court. When the parties exchanged their appraisal reports, Bassatne balked at inclusion of Jabbour's appraisal in the averaging contemplated by the agreement. Bassatne then formally terminated the agreement based upon Clause Six, contending that "[t]he opinion of value stated [by Jabbour's appraisal] is for the appraised land in a 'developable' condition with no consideration given to any cost for land preparation[,] whereas the appraised land is undeveloped raw land and requires extensive land preparation to it and adjacent land before it can be valued in a 'developable' condition."

The trial court granted summary judgment for Bassatne. He concluded that the "market value" appraisal required by the agreement referred unambiguously to a valuation of the land in its current condition, and that Jabbour's appraisal therefore breached Jabbour's obligation under the agreement and disqualified him from obtaining specific performance. The court later granted Rule 11 sanctions against Jabbour personally, finding that he had known his appraisal violated the

1. In this opinion, "Bassatne" will refer collectively to appellees Bahaeddine Bassatne and Bassatne Holding, S.A. and "Jabbour" will refer

collectively to appellants Georges M. Jabbour, Bahamas Leisure & Resorts, Ltd., and Investors Group International, Inc.

agreement, yet had asserted full compliance to his attorney in causing her to file a complaint for specific performance.

## II.

 Jabbour's compliance with the requirement that each side furnish a market value appraisal was a "condition precedent" to his right to seek specific performance. *Ferguson v. Caspar*, 359 A.2d 17, 24 (D.C. 1976) (citation omitted). Thus, it is beside the point whether, as Jabbour repeatedly questions, Bassatne fulfilled his end of the bargain. *Id.* at 23–24 (buyers were not entitled to specific performance owing to failure to pay as contract required, although sellers failed to comply with another provision requiring conveyance free of housing code violations); *see also In re Hoffman*, 63 N.J. 69, 304 A.2d 721, 727 (1973); 5A CORBIN, CONTRACTS § 1175, p. 294–95, § 1183, p. 339 (1964). The question presented on Jabbour's appeal from the grant of summary judgment is whether the trial court correctly read the agreement to require Jabbour to furnish an appraisal reflecting the current, "as is" value of the land. Whether a contract is unambiguous (as the court found this one to be on the disputed point) is a question of law. *Holland v. Hannan*, 456 A.2d 807, 815 (D.C.1983). Jabbour does not disagree that if the court's reading of the agreement is correct as a matter of law, the appraisal he supplied did not satisfy his obligation under the agreement.

 Contract interpretation begins with the language of the contract itself. "When language of a contract is clear and unambiguous on its face, we will assume that the meaning ordinarily ascribed to those words reflects the parties' intentions." *Obelisk Corp. v. Riggs National Bank of Washington, D.C.*, 668 A.2d 847, 853 (D.C.1995) (citation omitted). The language may also be viewed in context to determine what a reasonable person in the shoes of the parties making the agreement would have thought its language meant. *1010 Potomac Assoc. v.*

*Grocery Mfrs.*, 485 A.2d 199, 205 (D.C.1984). This hypothetical reasonable person is presumed to know the full circumstances surrounding the making, and "is bound by all usages which either party knows or has reason to know." *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982). The trial court concluded that "a reasonable person in the parties' position would think [a] 'market value' appraisal meant a determination of what the land would sell for in its current condition." We agree.

First, the contract called for Jabbour to transfer to Bassatne cash in the amount of $3,450,000 or "certain parcels of land ... with a value *equivalent to* ... $3,450,000" (emphasis added). A reasonable person would assume land to be equivalent to specified cash only if valued in its current condition on the competitive market, *not* after costly alterations as yet unmade had turned it from raw land into a "developable" condition. Moreover, Jabbour's own appraisal reflected this understanding. It (as well as Bassatne's appraisal) cited the definition of "market value" contained in the Appraisal Foundation's Uniform Standards of Professional Appraisal Practice, quoted in the margin.[2] Jabbour's appraisal purported to assess "market value" as so defined, but expressly assumed the land to be in a "developable" or ready-to-build condition without regard to the costs of bringing it to that state. As the trial court observed, "[t]he prudent, well informed buyer would know the current condition of the land and pay a reasonable price for the land, not a price that assumed the land to be in a 'different' or 'more developed' condition."

As pointed out, Jabbour does not dispute that if market value includes consideration of the current, as-is condition of the land, his appraisal was deficient. In his brief he merely points to other concepts customarily taken into account in land valuation—such as "permitted use" and "highest and best use"— without explaining why it is that a prudent

---

2. "Market value" is defined in the Standards to mean "[t]he most reasonable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale with the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimuli."

buyer would pay a price based on these uses while disregarding entirely the present condition of the land. *Cf. District of Columbia v. Lot 813 in Square 568*, 232 F.Supp. 714, 716 (D.D.C.1964) (jury instructed to base condemnation aware on the *"present fair market value* [of the land] in view of the most valuable use or uses for which it is shown to be adapted" (emphasis added)). In his deposition Jabbour effectively conceded the illogic of that position by admitting that under the agreement "we had to appraise [the land] as it is." And that the appraisal did not do so was admitted by the appraiser, Joel Watts, in a post-transaction memorandum to his superior pointing out that he had been "explicit[ly] instruct[ed] that this appraisal was to be made as if the roads and power lines were in place [and] that any needed filling of low lying areas had been completed." Watts further admitted that by thus treating the land as though "building could begin" while "ignor[ing] any additional cost which might be incurred to bring [it] up to [that] condition," the appraisal had been "unorthodox[ ]" and open to justified criticism.[3]

We conclude that the trial court gave the term "market value" its only reasonable meaning in the circumstances. As Jabbour concededly supplied no valuation of the land as thus defined, summary judgment was properly granted in Bassatne's favor.

### III.

■ The trial court imposed Rule 11 sanctions in the form of attorney's fees on Jabbour himself rather than his attorneys. As this court stated in *Park v. Sandwich Chef, Inc.,* 651 A.2d 798 (D.C.1994), while Rule 11 explicitly gives the court authority to follow this course, "fining a represented party is a very severe sanction that should be imposed with sensitivity to the facts of the case and to the party's financial situation." *Id.* at 803 (quoting 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE

§ 1336, at 102–04 (1990)). In general, "[a] party represented by an attorney should not be sanctioned under Rule 11 for a paper signed by the attorney unless the party had actual knowledge that filing the paper constituted wrongful conduct, *e.g.*, the paper made false statements or was filed for an improper purpose." *Calloway v. Marvel Enter. Group*, 854 F.2d 1452, 1474 (2d Cir.1988), *rev'd on other grounds, Pavelic & LeFlore v. Marvel Enter. Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). Professors Wright and Miller likewise acknowledge that sanctions "attributable to misrepresentations by the client reasonably relied upon by an attorney should fall on the client rather than counsel." WRIGHT & MILLER, *supra* (quoted in *Park,* 651 A.2d at 803). This court reviews the trial court's disposition of a motion for Rule 11 sanctions for abuse of discretion. *Park,* 651 A.2d at 802.

■ The trial court found that Jabbour misrepresented to his attorneys that he had complied with his obligations under the settlement agreement. "An attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable." *Calloway,* 854 F.2d at 1470; *see also Gray v. Washington,* 612 A.2d 839, 842 (D.C.1992). Jabbour might have argued that his attorney in filing the complaint relied unreasonably on Jabbour's assertion that he had met his obligations—that the same non-conformity between the settlement agreement and the appraisal report later found by the court should have been evident to an attorney conducting diligent inquiry.[4] But Jabbour did not make this argument in the trial court (then represented by successor counsel), and does not do so on appeal. Instead, besides rearguing the irrelevant point that Bassatne too had violated the agreement, he asserts that he at least had a "reasonabl[e] and ... good faith," if mistaken, belief that he had furnished the required appraisal. This assertion, however, runs straight into the trial court's finding

---

3. Watts conceded that a later criticism of the Jabbour appraisal by an expert, Charles A. Moore, Jr., was "fair and for the most part accurate."

4. Another way of saying this would be that Jabbour did not make a "factual claim" to his lawyer but stated only his lay belief or conclusion that his appraisal conformed to the contract and that the lawyer should have verified that conclusion.

that Jabbour knew in fact that his representations were false, a finding we review only for clear error. D.C.Code § 17–305(a) (1989); *see Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 400, 405, 110 S.Ct. 2447, 2458, 2460, 110 L.Ed.2d 359 (1990). The trial court had substantial support for this finding, including Jabbour's admission in deposition that he knew the land had to be appraised "as is," and the evidence that he nonetheless instructed the appraisers to value it as if it were "ready to build" when it was not.[5]

The remaining question is whether the amount of attorney's fees was reasonable. It is unnecessary to recite this court's four factors governing that issue, *see Williams v. Mount Jezreel Baptist Church,* 589 A.2d 901, 911–12 (D.C.1991), because Jabbour adverts to them in only conclusory fashion. The trial court reduced Bassatne's request for attorney's fees from $233,246.08 to $137,641.75. He eliminated the $88,360.58 in fees generated by Bassatne's prior counsel, since counsel had supplied no affidavit explaining the rate and the work performed. And the court eliminated from consideration $7,243.75 in fees related to the filing of a supplemental memorandum in support of Rule 11 sanctions, finding the pleading unnecessary. As to the remaining fees and costs, the court found them reasonable and necessitated by the litigation Jabbour had initiated.

The trial court found "that only a substantial sanction will serve as an adequate deterrence to Jabbour," who "stood to gain a substantial amount of money" if his overvaluation were accepted, and who had "engaged in bad faith litigation" and "forced [Bassatne] into court on false pretenses." On this record, we cannot question that judgment. In response to Jabbour's assertion that the award imposed undue hardship on him, *see Williams,* 589 A.2d at 912 ("offending party's ability to pay" one factor), the trial court correctly noted that "the burden [is] upon the part[y] being sanctioned to come forward with evidence of [its] financial status." *White v. General Motors Corp.,* 908 F.2d 675, 685 (10th Cir.1990). Jabbour pre-

sented no such evidence on this point. We uphold the imposition of sanctions and the amount assessed as reasonable.

*Affirmed.*

---

5. Watts also pointed out in his memorandum, *supra,* that Jabbour had instructed him to change the term "ready to build," initially used in the appraisal to describe the condition of the land, to the more nebulous term "developable."