# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CA-00573-SCT

*PAUL BROADHEAD AND MORRIS NICHOLSON*

*v.*

*BONITA LAKES MALL, LIMITED PARTNERSHIP;*
*BONITA PROPERTIES, INC.; LAUDERDALE*
*COUNTY BOARD OF EDUCATION, LAUDERDALE*
*COUNTY BOARD OF SUPERVISORS, AND STATE*
*OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/10/96 |
| TRIAL JUDGE: | HON. SARAH P. SPRINGER |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN F. HAWKINS |
| | JOHN L. MAXEY, II |
| | SAMUEL L. BEGLEY |
| ATTORNEYS FOR APPELLEES: | RALPH EDWARD YOUNG, JR. |
| | PAUL SCOTT PHILLIPS |
| | MACK CAMERON |
| | ROBERT H. COMPTON |
| | SUSAN ALEXANDER SHANDS |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 10/23/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/13/97 |

**BEFORE PRATHER, P.J., BANKS AND McRAE, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This case is before the Court on appeal from a decision in chancery court confirming two sixteenth section land leases. We conclude that the record amply supports a finding that the appraisals of school lands were performed by a competent appraiser, despite the fact that the appraiser had been assigned an interest in the proceeds of a sublease in the same sixteenth section. The appraiser's interest is fixed in value and unaffected by any value established for the subject property he appraised. Various other alleged violations of the USPAP appraisal standards are not sufficient to render the

appraisals incompetent. We also conclude that the issues raised relating to the chancellor's evidentiary rulings and the school board's fiduciary duty have no merit. Accordingly, we affirm.

I.

¶2. The Lauderdale County Board of Education (LCBE), with supervision from the Lauderdale County Board of Supervisors (LCBS), holds sixteenth section lands in trust for the students within its district, and grants leases on these lands to raise revenue for their educational benefit. LCBE is represented by John Ed Ainsworth, a public administration consultant specializing in business related to school districts and state government agencies. In 1993, Ainsworth, on behalf of LCBE, entered into negotiations with developers Hardy Graham and Ed Johnson, owners of Bonita Lakes Mall Limited Partnership (BMLP) and Bonita Properties, Inc. (BPI) (referred to jointly as "Bonita" unless otherwise noted). These negotiations concerned a proposed shopping mall development on sixteenth section land in Meridian, Mississippi, which at that time was in two adjoining tracts, one containing approximately 120 acres and the other containing approximately 40 acres. In anticipation of granting a lease to Bonita, appraisals on these adjoining lands were conducted by Alex Smith to determine a fee market value upon which a lease value could be based. Smith, owner of Appraisers Associated, is a Member of the Appraisal Institute (MAI) and had conducted numerous appraisals for LCBE in the past. Separate appraisals on these properties were necessary because they had distinct chains of title and the smaller parcel was the subject of separate negotiations concerning release of previous leases back to LCBE.

¶3. The first of the appraisals was conducted on the 120-acre tract and was dated September 1, 1993. Smith placed a fee market value on this land of $264,000, or $2,200 per acre. The second appraisal was performed on the 40-acre tract and was dated September 10, 1993. Smith placed its value at $600,000, or $15,000 per acre. The higher value of the smaller parcel was due to flatter topography and valuable road frontage. Smith testified that even though this road frontage was encumbered by a pre-existing lease, he included the value of accessibility in his conclusion because his task was to assess a fee market value independent of leasehold interests. Smith declared the "highest and best use" of both properties to be commercial and/or industrial type development, predominantly commercial retail development.

¶4. After Smith's appraisals were completed, LCBE retained Jerry Mask, another MAI appraiser, to conduct review appraisals of the subject properties. Mask's review appraisals, dated October 12, 1993, indicated the values established by Smith were reliable. In conducting their appraisals, Smith and Mask both made use of the "sales comparison approach," in which the value of subject property is determined by examining assorted sales of other lands which are deemed, according to various factors, to be comparable.

¶5. Ainsworth checked the appraisal reports to insure they contained the required components and then relied on them in negotiating the land leases with Bonita. The development was negotiated as a single 160-acre tract, since it was contemplated there would be only one lease. Accordingly, Ainsworth instructed Smith to review, update and combine the appraisals done earlier. The report for this combined appraisal update is dated May 26, 1995, and the calculations are made as of January 1, 1995. The subject property of this update appraisal contained 159.85 acres.[1] Smith placed the value of these combined parcels at $730,000, and Ainsworth demanded an annual rent of nine percent, or

$65,700. Importantly, a small subparcel containing approximately five acres was not included in this update appraisal. This subparcel was land on which two restaurants were located, and was encumbered by a pre-existing leasehold interest to a company called Hannaford Properties.[(2)] Since this subparcel contained the roadway frontage, Smith determined the combined remaining parcels to be essentially "landlocked" and lowered their value accordingly.

¶6. BMLP and BPI subsequently decided to take separate leases. The land was again divided into two tracts--though not in the same manner as they had originally been divided. In determining rent, Ainsworth prorated the annual rental amount of $65,700 between the two leases based on the number of acres to each lessee, and entered into leases with both Bonita entities on June 12, 1995. BMLP entered into a Commercial Lease Contract for 116.41 acres, at an annual rental cost of $48,338.62. BPI entered into a Commercial Lease Contract for 41.81 acres, at an annual rental cost of $17,361.38. Both leases were payable a year in advance over the forty years of the lease, with options to renew for twenty-five years.

¶7. After execution of the Commercial Lease Contracts, both were discovered to contain mistakes. The lease to BMLP missed a call in the metes and bounds description, and BMLP requested an amendment to correct the property description. In BMLP's case, there was no increase in the acreage as a result of this correction and Ainsworth determined that no updated appraisal was necessary. Accordingly, LCBE and BMLP executed an Amendment to Commercial Lease Contract in order to correct the error in the legal description. The property description in the lease to BPI also contained an error. The error omitted approximately 1.63 acres from the legal description along the Northern property line. BPI requested an amendment to include the additional acreage. Because additional acreage was being added to the lease, Ainsworth instructed Smith to perform an update appraisal on that tract, which now totaled 43.44 acres. Smith performed this update appraisal on August 23, 1995, and set the fee market value of this tract at $360,000, or $8,300 per acre. In accordance with Smith's update appraisal, an Amendment to Commercial Lease Contract was executed between LCBE and BPI providing for increased rent. Apparently, the increased rental amount was calculated by applying the increased per acre price to the additional 1.63 acres only.

¶8. On September 13, 1995, each Bonita entity filed a Complaint to Confirm Sixteenth Section Land Lease in the Lauderdale County Chancery Court. The Complaints sought to confirm the Commercial Lease Agreements and Amendments. The two actions were subsequently consolidated by the court below for trial purposes. Named defendants included LCBE, LCBS, the State of Mississippi and all other potentially interested parties. Appellants Paul Broadhead and Morris Nicholson were named as defendants since they had been involved in four previous lawsuits concerning the mall development site.[(3)]

¶9. Defendants LCBE and LCBS filed a joint answer to the Bonita Complaints on November 16, 1995, essentially admitting all averments by Bonita. Thus, defendants LCBE and LCBS support confirmation of the land leases and by their own admission are "more closely aligned" with plaintiff Bonita.[(4)] Defendants Broadhead and Nicholson, the only parties opposing the leases, filed for each Complaint an Answer, Defenses, Counter-Claim and Cross-Claim on October 16, 1995, alleging that the leases were void for failure of LCBE to obtain a rental of at least five percent of the current market value of the property as required by Miss. Code Ann. § 29-3-63(2), and that the leases and subsequent amendments were "furthermore illegal and void" under Miss. Code Ann. § 29-3-107. The

Bonita entities, as counter-defendants, answered their respective counter-claims on November 13, 1995, denying them in all material respects. Likewise, LCBE and LCBS, as cross-defendants, answered the cross-claims on November 16, 1995.

¶10. The case was marked by numerous discovery disputes and motion hearings. Bonita filed a Motion for Partial Summary Judgment on March 15, 1996, requesting the court to adjudicate and confirm that the Commercial Lease Contracts and the Amendments were duly executed and recorded in compliance with Miss. Code Ann. § 23-3-1 *et. seq.* The chancellor granted the Motion for Partial Summary Judgment after a hearing conducted on March 25, 1996. The court found that only two issues were saved for trial: competency of the appraisals conducted on the properties and the adequacy of consideration in the two subject leases. At the same hearing, the chancellor considered argument on Bonita's Motion *in limine* requesting the court to exclude testimony during trial by David Bolton and Wayne Baer, witnesses whom the appellants sought to call as experts. The court granted Bonita's Motion.

¶11. At trial, Lynn G. Scogin, expert witness for the appellants, sought to discredit the appraisals and update appraisals performed by Smith and relied upon by LCBE in executing the leases with Bonita. His main contentions were that Smith was not a disinterested appraiser and that Smith neglected to include in his final estimate of value certain anticipated roadway and infrastructure improvements which were tied to the mall project and funded by public monies.

¶12. The chancellor confirmed both leases and issued her Judgment on May 10, 1996, incorporating by reference the findings and conclusions detailed in the court's earlier Memorandum Opinion and Judgment. Broadhead and Nicholson now bring this appeal.

## II.

¶13. Our standard of review for factual determinations made by a trial judge sitting without a jury is the substantial evidence standard. *Hill v. Thompson,* 564 So. 2d 1, 10 (Miss. 1989); *UHS-Qualicare v. Gulf Coast Community Hosp., Inc.*, 525 So. 2d 746, 753 (Miss. 1987). We will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Herring Gas Co. v. Whiddon,* 616 So. 2d 892, 894 (Miss.1993).

## III.

¶14. Appellants Broadhead and Nicholson first contend that the chancellor committed reversible error in holding that Alex Smith's appraisals were competent in light of the fact that Smith holds an interest in property located in the same sixteenth section as the land he was appraising. The property referred to is a McDonald's restaurant located across the road from the subject property in this case. Appellants argue this ethical violation invalidates Smith's appraisals and addendum updates upon which LCBE and LCBS based their decision to lease school lands to Bonita, thus voiding the leases.

¶15. Appellants base their claim in part on an ethics provision in the Uniform Standards of Professional Appraisal Practice (USPAP), a set of standards statutorily imposed on licensed real estate appraisers under Miss. Code Ann. § 73-34-37 (1995). This provision reads as follows:

> An appraiser must perform ethically and competently in accordance with the standards and not engage in conduct that is unlawful, unethical, or improper. An appraiser who could reasonably be perceived to act as a disinterested third party in rendering an unbiased appraisal, review, or consulting service must perform assignments with impartiality, objectivity, and independence and without accommodation of personal interests.

USPAP Ethics Provisions, Preamble at 2 (1993 ed.). The heart of Appellants' argument is that Smith was not "disinterested" as defined by this standard.

¶16. In support of their claim appellants also cite *Hill,* 564 So. 2d at 12-13, a case involving appraisers who were freeholders of sixteenth section land leases at the times of the appraisals. The *Hill* Court defined the term "disinterested" as meaning "[n]ot concerned, in respect to possible gain or loss, in the result of the pending proceedings or transactions; impartial, not biased or prejudiced," and noted that "interested parties" were generally defined as "parties who have a pecuniary interest in the subject of the contest." *Hill,* 564 So. 2d at 13 (quoting Black's Law Dictionary 421 (5th ed. 1979) and *Provenza v. Provenza,* 201 Miss. 836, 843, 29 So. 2d 669, 670 (1947). Other states have construed the term similarly in the appraisal context. *See e.g.,* ***Schipper & Block, Inc. v. Carson Pirie Scott &Co.,*** 256 N.E.2d 854, 857 (Ill. App. Ct. 1970) ("[d]isinterested" defined as "[n]ot having any interest in the matter referred to or in controversy; free from prejudice or partiality; impartial or fair minded; without pecuniary interest; not previously interested; not biased or prejudiced.").

¶17. In *Hill,* this Court concluded that fellow lessees of sixteenth section land in the county were not disinterested, *Hill,* 564 So. 2d at 13, and voided the leases on land which they had appraised. The statute at issue in *Hill* expressly required that appraisers of sixteenth section land be "disinterested freeholders." Under current sixteenth section land law there is no longer an express statutory requirement that appraisers be "disinterested." Instead, the law provides that "the board of education shall appoint a competent appraiser." Miss. Code Ann. § 29-3-65(1) (1990).

¶18. USPAP Standard Rule 2-3 lays out the certification requirements that an appraiser must include within every written real property appraisal report:

> I certify that, to the best of my knowledge and belief:
>
> --the statements of fact contained in this report are true and correct.
>
> --the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses and conclusions
>
> --I have no (or the specified) present or prospective interest in the property that is the subject of this report, and I have no (or the specified) personal interest or bias with respect to the parties involved.
>
> --my compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.
>
> --my analyses, opinions, and conclusions were developed, and this report has been prepared, in

conformity with the Uniform Standards of Professional Appraisal Practice.

--I have (or have not) made a personal inspection of the property that is the subject of this report. (If more than one person signs the report, this certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraised property) (footnote omitted).

--no one provided significant professional assistance to the person signing this report. (If there are exceptions, the name of each individual providing significant professional assistance must be stated.)

USPAP, Standards Rule 2-3 (1993 ed.). It is apparent from the above provision, as well as the USPAP preamble, that these standards do not render incompetent an appraiser with interests in nearby land or in the subject property being appraised. The emphasis of USPAP is on disclosure of any material interest which the appraiser may have.

¶19. In the present case, Smith's 1993 appraisal report clearly followed the form of the above certification requirements. The issue, then, is whether Smith's interest in the nearby McDonald's property was an interest which would have materially affected his opinion of value on the subject property, and if so, whether it was disclosed. Appellants argue that "Mr. Smith's interest in the McDonald's property will be more secure with the development of a major, regional commercial mall constructed immediately adjacent to the McDonald's property."

¶20. Smith and his company each hold a five percent assignment of rents from a sublease between McDonald's Corporation and the original sixteenth section leaseholders, which Smith accepted as commissions for negotiating the sublease. The underlying sixteenth section lease is a confirmed 99-year paid-up lease with approximately eighty years remaining. The sublease to McDonald's is a "base land lease which calls for an average annualized increase of 2% with the payment schedule amount adjusted every five years . . . It began based upon an annualized 6.43% return figured against a lot value of approximately $350,000. . ." In other words, the starting point for the sublease is a percentage of a fixed amount which increases according to a schedule. This confirms Smith's testimony at trial that payments to him are predetermined and therefore unconnected with the value of surrounding properties. As the appellees correctly argue, "the dollars owed to Mr. Smith were set when the deal was done in 1990 and will remain set with 2% increases per year and re-adjusted every five (5) years." Moreover, Smith testified that he disclosed his interest in the property to the School Board attorneys through whom LCBE worked.

¶21. This case is factually distinguishable from *Hill,* in which the appraisers were found not to be disinterested after they set a nominal value on sixteenth section land. In *Hill,* one of the appraisers was a cousin of the original leaseholder of the subject property, and the appraisers themselves were sixteenth section land leaseholders. In addition, directly after they completed their appraisal of the property that was the subject of the suit their own sixteenth section leases were renewed. *Id.* Unlike the freeholders in *Hill,* Smith cannot be said to have a "pecuniary interest in the subject of the contest." *Id.* Thus, the chancellor was not manifestly in error when she found Smith competent, notwithstanding his interest in the McDonald's sublease contract.

IV.

¶22. Broadhead and Nicholson next contend that Smith, in performing his appraisals and update appraisals, violated numerous other professional standards under USPAP which rendered his appraisals incompetent. An initial question on which the parties disagree is whether Smith's alleged USPAP violations, standing alone, would invalidate the leases, or whether such violations merely weigh in favor of invalidation. Bonita contends this case is really about one issue: whether the leases issued by LCBE should be confirmed pursuant to the provisions of Miss. Code Ann. § 29-3-1 *et. seq.* because the leases were issued for amounts that were not grossly inadequate in violation of Miss. Const. Art. 4, § 95.[5] Implicit in this claim is that even if Smith had violated USPAP standards, his violations would not invalidate the leases unless they constituted a material breach. Appellants respond that Mississippi law requires "a disinterested, competent appraiser who, in the performance of the appraisals complies with the legally mandatory provisions of [USPAP]" as codified by Miss. Code Ann. § 73-34-37.

¶23. Not every breach of an appraiser's professional standards will render an appraisal invalid. Like the other codes of ethics in Title 73, USPAP is codified so that state licensing agencies may pursue those who continuously or materially breach ethical standards. *See* Miss. Code Ann. § 73-34-9(2)(d) & (h)(1995) (granting Mississippi Real Estate Commission and Mississippi Real Estate Appraiser Licensing and Certification Board powers to establish appropriate administrative procedures for disciplinary proceedings and suspension or revocation of licenses).

¶24. The issue is whether there is substantial evidence to conclude that Smith did not commit material violations of USPAP, such that LCBE failed to appoint a competent appraiser as required under Miss. Code Ann. § 29-3-65 (1990). Lynn Scogin, the appellant's expert witness, reviewed Smith's work and testified that Smith violated the following provisions of USPAP: Rule 2-1(a), requiring an appraisal report to clearly and accurately set forth an appraisal in a manner that will not be misleading; Rule 2-1(b), requiring an appraisal report to contain sufficient information to enable the person(s) who receive or rely on the report to understand it properly; Rule 2-1(c), requiring an appraiser to clearly and accurately disclose any extraordinary assumptions or limited conditions that directly affect the appraisal and indicate its impact on value; Rule 2-2(h), requiring an appraisal report to set forth the information considered, the appraisal procedures followed, and the reasoning that supports the analyses, opinions, and conclusions; Rule 1-1(b), requiring appraisers not to commit a substantial error of omission or commission that significantly affects an appraisal; and Rule 1-1(c), requiring appraisers not to render services in a careless or negligent manner.

¶25. Scogin also opined that Smith had violated Rule 1-4(f), which provides:

> In developing a real property appraisal, an appraiser must observe the following specific appraisal guidelines, when applicable:
>
> (f) consider and analyze the effect on value, if any, of anticipated public or private improvements, located on or off the site, to the extent that market actions reflect such anticipated improvement as of the effective appraisal date.

USPAP, Rule 1-4(f) (1993 ed.). Lastly, Scogin testified that Smith had violated USPAP Advisory Opinion G-3, dealing with update appraisals.[6]

¶26. Violations of the first six general provisions are based in part on Scogin's opinion that two

separate value opinions should have been rendered in the 1993 appraisals--one based on comparisons of vacant lands and one based on lands already leased--on the theory that this makes a difference in the underlying value of the subject property. This makes no sense. The land Smith was appraising was vacant and was being leased as a future shopping mall site. How the value of already leased lands could alter the inherent value of vacant property being leased by the school board is not explained. Neither does Scogin refer to any provisions in USPAP which would require this to be done as a matter of course.

¶27. It is evident from his testimony that Scogin also based the general violations on the subsequent charges that Smith had breached Rule 1-4(f) and Advisory Opinion G-3. After reciting that he had found violations of the first six rules, Scogin testified:

> Then we move to Rule 1-4(f), which states, consider and analyze the effects of value, if any, of anticipated public or private improvements located on or off the site to the extent that market actions reflect such anticipated improvements as of the effective appraisal date.

> Well, these are the major items that I found in reviewing the appraisal reports. These sections and subsections that I point out in Standard Rule, both 1 and 2. But these run hand in hand, as I previously stated, if--they're like a domino effect. If one is violated, then it tends to pick up the language in the other one. But these are the basic ones that pertain to my review of these two appraisal reports and the two updates.

Scogin then went on to discuss the alleged violations under Rule 1-4(f) and Advisory Opinion G-3 almost exclusively.

¶28. The violation of Rule 1-4(f) relates to Scogin's opinion that Smith's final appraised value should have included anticipated infrastructure and highway improvements in the shopping mall area which would be paid for with public monies, on the theory that absence of consideration of these improvements

> . . .would have a strong effect on the highest and best use. It would have a strong effect on the final estimate of value. It would be extremely important to determine if this was the developer's cost, or if it was someone else's cost, and if it would be one of the controlling factors in the selection of comparable sales considered for the final estimate of value.

The record shows that Smith did not neglect to consider the proposed improvements, but merely arrived at a different conclusion than Scogin as to whether they affected the inherent value of the land. On cross-examination, Smith stated his reasons for not including the proposed improvements in his final estimate of value:

> I don't believe I failed to consider anything that was pertinent to this. All these improvements, you're talking about, are site specific for this project. Improvements that will happen in the normal course of development in an area would be considered. If this project does not start, these will not happen. In my opinion, at this point, with those plans and these items being tied to whether or not this mall is or is not built, it is speculative with reference to the raw market value of that piece of property.

Smith stated that he had looked at the information from the area and concluded there had been no market impact in anticipation of the mall that showed any significant increase or change in property values. Another expert, James Horne, agreed that "if the road were going to be built and not tied to a specific development, it would probably enhance the market value. But if the road were tied to a specific development, then it would not enhance the market value, in my opinion."

¶29. In support of their view, appellees offer the case of *Jabbour v. Bassatne,* 673 A.2d 201 (D.C. App. 1996) wherein the parties got into a dispute as to the "market value" of certain property. As to the definition of this term, the court ruled that

> [a] reasonable person would assume land to be equivalent to specified cash only if valued in its current condition on the competitive market, not after costly alterations as yet unmade had turned it from raw land into a "developable" condition.

*Jabbour,* 673 A.2d at 203.

¶30. Broadhead and Nicholson also allege a violation of Advisory Opinion G-3, which deals with update appraisals. The opinion provides:

> Since the update is an extension of an original appraisal, three conditions must be met before an update assignment is accepted:
>
> 1. The original appraiser/firm and client are involved.
>
> 2. The real estate has undergone no significant change since the original appraisal.
>
> 3. The time period between the effective date of the original appraisal (or most recent update) and the effective date of the pending update is not unreasonably long for the type of real estate involved.

USPAP, Advisory Opinion G-3, at 87 (1995 ed.). Appellants allege the second of these requirements was breached because the subject property had undergone significant change since the first appraisals were completed. They base this contention on the tentative plans for infrastructure improvements and on the "entirely different configurations" of the properties appraised at various times and the confusion which this created. While appellants argue that Smith and Horne both admitted the land had undergone significant change, this is refuted by their testimony at trial. Smith consistently denied it. Horne admitted only that the individual parcels ultimately leased had changed sizes, but that the combined tract was the same general configuration as originally leased. Scogin testified that the different configurations required a new appraisal.

¶31. Thus, two core issues were before the court: whether the anticipated improvements should have been included in the fair market value of the land Smith appraised, and whether an update appraisal was inadequate because the land had undergone significant change. As to other violations, Horne testified that Smith violated Rule 2-1(b), since Smith had not adequately explained the proposed road in his update appraisal. Horne stated that this omission would not have constituted a breach if the original appraisal had been a restricted report to be relied upon by the client himself. But since the original 1993 reports were "self-contained," Horne felt the proposed road should have been explained since a plat included in the update appraisal raised a question not discussed in the original appraisal.

Horne also stated, however, that he nevertheless considered Smith's report a "reliable and valid indicator of value." Moreover, Broadhead and Nicholson offered no independent evidence of the value of the land which would call into question the materiality of any alleged violations by Smith. Scogin himself testified that he was not able to determine the impact on value of the alleged standards violations, but only that "it would raise additional questions that would require answers." When expressly asked whether he could state the fair market value of the sites, he replied, "No, sir."

¶32. The chancellor considered the sparse law on these issues and the testimony of the conflicting expert opinions in light of the facts, and found that Smith was correct in not considering the anticipated improvements to the property. The chancellor concluded that the "school board cannot lease that which is not there." She also noted that Scogin had conceded that the standards are so rigid that it would be almost impossible to fully comply with them. Where conflicting testimony is presented, expert and otherwise, the chancellor is required to make a judgment on the credibility of the witnesses in order to resolve the questions before the court. ***Doe v. Doe,*** 644 So. 2d 1199, 1207 (Miss. 1994). The chancellor found that Smith prepared thorough appraisals of the subject property and letter updates. Further, the language of Rule 1-4(f) and Advisory Opinion G-3 clearly grant some discretion to an appraiser in Smith's position, and any violations of the standards were minor. Thus, we conclude that the record, taken as a whole, amply supports the chancellor's findings.

V.

¶33. Appellants Broadhead and Nicholson next contend that the lower court, in light of the duty imposed by the importance of a sixteenth section lease confirmation suit, abused its discretion in excluding the testimony of David Bolton and/or Wayne Baer. Appellants hired Bolton shortly before trial in response to the employment of expert witness James Horne by appellees:

> With the designation of Mr. Horne as an additional expert appraiser, the defendants Broadhead and Nicholson immediately set about to find an appraiser qualified to conduct the research necessary to support a limited narrative appraisal report of the subject property. On or about March 12, 1996, David Bolton of David R. Bolton, Inc., Real Property Appraisers, was reached in Austin, Texas and invited to come to Meridian, Mississippi, to determine if there were sufficient time and resources available for him to write a competent limited narrative appraisal report based on the research necessary to write such a report. Mr. Bolton and Mr. Baer evaluated the resources in Meridian on or about March 13, 1996, and determined that through intensive research and writing, a report could be produced. . .

On March 15, 1996, Bonita filed a motion *in limine* to exclude the testimony and reports of Bolton based on the fact that the appellants had violated the court's discovery orders. Bonita had served its First Set of Interrogatories and Requests for Production of Documents on Broadhead and Nicholson on November 29, 1995, asking them to identify their expert witnesses. The court's scheduling order as originally entered gave a deadline for the completion of discovery of February 16, 1996. This deadline was later extended to March 1, 1996, to accommodate the completion of discovery and depositions. The court extended the deadline yet again for designation of additional experts to March 8, 1996, and required depositions to be completed by March 15, 1996. Broadhead and Nicholson supplemented their interrogatory responses designating Bolton and Baer on March 13, 1996, but at this time not even resumes of these experts were provided to opposing counsel. Trial was set to begin

on March 27, 1996, and no continuance was sought by either party.

¶34. At the hearing on March 25, 1996, Broadhead and Nicholson argued that Bonita's motion to exclude should be denied, emphasizing the importance that Bolton's upcoming report on the value of the subject property would bring to the lawsuit. They cited *Eastover Bank for Savings v. Hall,* 587 So. 2d 266 (Miss. 1991) for the proposition that "there is no hard fast rule as to what amounts to seasonable supplementation or amendment of interrogatory answers." Appellants further proclaimed a "public policy overlay of giant proportions." While recognizing the potential prejudice to opposing counsel of allowing Bolton's testimony, counsel for appellants claimed it could be cured by allowing them to depose Bolton during the week the trial was in recess.[7] Counsel for Bonita responded that this action amounted to "trial by ambush" because Bonita did not know the contents or bases of Bolton's opinions, and thus did not know "what to meet." Bonita emphasized that it was a day and a half before trial and the report by Bolton on the value of the sixteenth section land was not yet complete.

¶35. "[A]dmission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Sumrall v. Mississippi Power Co.,*693 So. 2d 359, 365 (Miss. 1997); *General Motors Corp. v. Jackson,* 636 So. 2d 310, 314 (Miss. 1992), *cert. denied*, 513 U.S. 928 (1994); *Walker v. Graham,* 582 So. 2d 431, 432 (Miss. 1991).

¶36. Miss.R.Civ.P. Rule 26(b)(4)(A)(i) requires that, upon request from the opposing party, a party must disclose not only the name of his expert witnesses, but he also must "state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." *See also **T.K. Stanley, Inc. v. Cason,*** 614 So. 2d 942, 950 (Miss. 1992). The purpose of this, and other Rules of Civil Procedure was stated in *Harris v. General Host Corp.*:

> We have long been committed to the proposition that trial by ambush should be abolished, the experienced lawyer's nostalgia to the contrary notwithstanding. We have sought procedural justice through a set of rules designed to assure to the maximum extent practicable that cases are decided on their merits, not the fact that one party calls a surprise witness and catches the other with his pants down.

*Harris,* 503 So. 2d 795, 796 (Miss. 1986); *In re Conservatorship of Stevens,* 523 So. 2d 319, 320-21 (Miss. 1988). *Accord **Jones v. Hatchett,*** 504 So. 2d 198, 201 (Miss. 1987). Rule 26(f)(1)(B) further requires a party to supplement responses in regard to "the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony." When a breach of the discovery rules occurs, one of the sanctions authorized under the rules is "an order refusing to allow the disobedient party. . . from introducing designated matters in evidence." Miss.R.Civ.P. Rule 37(b)(2)(B); *Conservatorship of Stevens,* 523 So. 2d at 321.

¶37. *Conservatorship of Stevens* is an appraisal case which is almost directly on point. In that case, the appellants claimed the lower court erred in not allowing the testimony of an appraiser. The appellant had failed to respond to a request for production of appraisals or other documents concerning the land in question until one day prior to trial, when the appellant finally supplemented her responses to include the name of the appraiser and a copy of his appraisal report.

***Conservatorship of Stevens,*** 523 So. 2d at 320. The lower court excluded the expert's testimony, and this Court ruled that the exclusion was not an abuse of discretion. ***Id.*** at 321. *See also* ***Jones,*** 504 So. 2d 198 (providing medical expert's name four days before trial not sufficient to discharge rule to supplement interrogatory answers, where supplement did not also reveal substance of expert testimony).

¶38. In the present case, it was not until the day before trial began that Bolton produced a preliminary report based on his research. The final report was not delivered until three days after trial had begun. In arguing for admission, counsel for Broadhead and Nicholson offered vague justifications based on public policy and the importance of the information. Further, they offered no convincing reason for waiting so late to employ Bolton--it is a mystery why they considered an independent appraisal of value important only "after the designation of Mr. Horne as an additional expert appraiser." In fact, Horne was not called in Bonita's case-in-chief. He was a rebuttal witness to be called in response to Scogin. As it happened he was subpoenaed and called by Broadhead and Nicholson during their case. The chancellor considered the appropriate rules of civil procedure in ruling to exclude Bolton's and Baer's testimony, and we conclude that her ruling was not an abuse of discretion.

VI.

¶39. In their next assignment of error appellants Broadhead and Nicholson raise additional evidentiary issues, claiming the trial court abused its discretion by excluding the admission of certain exhibits into evidence. These items fall into two groups: the first contains certain documents submitted for the court's consideration after trial, and the second consists of certain documents excluded by the court during trial.

¶40. The first group of exhibits for which appellants raise an issue are related to Alex Smith's interest in the nearby McDonald's property, and were offered by appellants in a Motion to Supplement the Record filed April 24, 1996. These three documents were a Consent Judgment Confirming Sixteenth Section Land Leases, a Revised Memorandum Lease, and a Partial Assignment of Ground Sublease and Rents. They were cumulative of Smith's undisputed testimony at trial and confirmed: that the original lease was a paid-up, ninety-nine year lease confirmed by the Lauderdale Chancery Court; that the ground lease had been sublet by the original leaseholders to McDonald's Corporation; that Smith and his company, Appraisers Associated, had received a partial assignment of this sublease and the rents derived from it; and that the rentals received by Smith represented a fixed sum.

¶41. Miss.R.Evid. 403 expressly allows a trial court to exclude evidence which it finds to be cumulative. ***Knotts by Knotts v. Hassell***, 659 So. 2d 886, 891 (Miss. 1995); *see also* ***Clark v. City of Pascagoula,*** 507 So. 2d 70, 76 (Miss. 1987) (holding that trial judge did not abuse his discretion by excluding cumulative evidence). "The touchstone of Rule 403 is whether or not the evidence--of whatever type--is cumulative, and if evidence is in fact cumulative it is within the discretion of the court to exclude said evidence." ***Knotts,*** 659 So. 2d at 891. Although these documents should be argued to be the best evidence of Smith's arrangement, *see* Miss.R.Evid. 1002, the nature of the arrangement is undisputed. The parties differ only over the consequences of the arrangement. Thus, the chancellor did not abuse her discretion by failing to consider these documents in her ruling.

¶42. The second group of items for which appellants raise an issue consist mainly of documents relating to the roadway infrastructure improvements proposed by various government agencies in

connection with the Bonita Lakes mall development project. Another document in this group is the Participation Agreement entered into between LCBE and Hannaford Properties which settled the lease confirmation lawsuit between those parties. It is worth noting that this document was already in evidence, absent the unidentified handwriting found on appellants' proffered copy.

¶43. The lower court issued clear instructions for how discovery was to proceed, and as noted above the court extended its deadlines numerous times. Moreover, when Broadhead did not comply fully with Bonita's requests for discovery, Bonita filed a Motion to Compel Discovery, and the chancellor issued an order compelling Broadhead to "produce any other documents which he relied upon in support of his answer, counterclaim and cross-claim on or before March 8, 1996." When asked at trial to explain the failure to produce these documents, Broadhead's lawyer admitted that he had been in possession of the documents for some time and that failure to produce them was due to "negligence" and "inadvertance on the part of counsel." The chancellor excluded the documents on the ground that "inadvertance is not sufficient excuse to avoid the Orders of this Court." She also noted that this was not the first discovery violation by counsel for appellants, and cited counsel for contempt of court.

¶44. The control of discovery is a matter committed to the sound discretion of the trial judge. ***Barnes v. A Confidential Party,*** 628 So. 2d 283, 290 n.7 (Miss. 1993); ***Dawkins v. Redd Pest Control Co., Inc.,*** 607 So. 2d 1232, 1235 (Miss. 1992). The trial court has need of great flexibility in dealing with abuses of the discovery rules, and this Court has stated that trial courts have considerable discretion in the imposition of sanctions under Miss.R.Civ.P. Rule 37. ***Cunningham v. Mitchell***, 549 So. 2d 955, 958 (Miss. 1989); ***White v. White,*** 509 So. 2d 205, 207 (Miss. 1987). Where a party fails to comply with a court order permitting discovery, the court may refuse to allow the disobedient party to support its claims with the undisclosed evidence. ***Ladner v. Ladner,*** 436 So. 2d 1366, 1370 (Miss. 1983). In the present case, there was no abuse of the chancellor's discretion.

VII.

¶45. Appellants Broadhead and Nicholson launch yet another attack to invalidate the leases, this time based on the claim that the members of LCBE and LCBS breached their fiduciary duties as trustees of school lands. The charge centers around the so-called Hannaford properties, which were the subject of a confirmation suit against LCBE by pre-existing leaseholders Hannaford Properties, L.P.[8] Settlement was reached and memorialized in a Participation Agreement between LCBE and Hannaford, by which Hannaford would receive a portion of the revenue from the portions of land it released back to LCBE. Broadhead and Nicholson contend

> . . . The Court in this case merely relied on John Ed Ainsworth's formula of determining fair market rental without considering the effect of the loss of the Hannaford Properties revenues. Because of the Hannaford deal, 40% of gross revenue from significant portions of each of the leases in question is not going to benefit the school children at all, but rather is going to an interested, private third party. . . The Ainsworth formula conspicuously fails to consider the loss of these revenues and there is no testimony on behalf of the School Board or Board of Supervisors to explain how, with the loss of significant proceeds from the leases in questions [sic], the School Board will receive the statutory minimum from the leases in question in this case.

¶46. LCBE and LCBS argue that this claim was dispensed with in the court's grant of Partial Summary Judgment, which established that the lease contracts were made and recorded in substantial conformity with the law pursuant to Miss. Code Ann. § 29-3-52 and saved for trial only the issues of competency of the appraisals and adequacy of consideration. Appellants' claim goes to the fundamental issue of whether adequate consideration was obtained for the lease of sixteenth section land. Therefore, the claim must be addressed on the merits, and reversed if it is shown the chancellor was manifestly wrong in concluding that adequate consideration was paid in spite of a breach of fiduciary duty on the part of LCBE and LCBS.

¶47. Sixteenth section school lands, or lands granted in lieu thereof, constitute property held in trust for the benefit of the public schools and must be treated as such. Miss. Code Ann. § 29-3-1(1) (1990) . The standard of care chargeable to members of school boards in the performance of this statutory duty is the same standard applicable to a general trustee. As trustees, members of the Board "are bound in the management of all the matters of the trust to act in good faith and employ such vigilance, sagacity, diligence and prudence as in general prudent [persons] of discretion and intelligence in like matters employ in their own affairs." ***Turney v. Marion County Board of Education***, 481 So. 2d 770, 777 (Miss. 1985); (quoting Bogert, Law of Trusts, § 93 (5th ed. 1973)). *see also **Morrow v. Vinson,*** 666 So. 2d 802, 806 (Miss. 1995). Included in this standard of care is a duty to obtain rental fees on leased land which meet the statutory minimum provided in § 29-3-63.[(9)]

¶48. The issue is whether LCBS and LCBE, in spite of the Participation Agreement with Hannaford, breached their fiduciary duties by obtaining less than the statutory minimum of five percent of current market value on lands currently being leased. However, it cannot be said that LCBE was under any statutory duty for already encumbered land. Hannaford had a 99-year paid-up lease on the entire 40-acre parcel. LCBE considered defending the confirmation lawsuit against Hannaford, but concluded that it was unclear whether the lease would be confirmed and that it was better to settle. The settlement, which released thirty-five crucial acres back to LCBE, allowed the shopping mall negotiations to proceed--otherwise the land would have remained encumbered, and LCBE would have gained nothing more from those sixteenth section lands until the lease expired in the year 2061. The leases to Bonita do not extend beyond this time period. Thus, LCBE was under no duty to obtain the statutory minimum from the thirty-five acres released back to them.

¶49. When the two Bonita entities decided to take separate leases, the land was divided into two tracts, but were not divided as they originally had been in the original appraisals.[(10)] Thus, some portion of the land for which LCBE is under a statutory duty to collect five percent of current market value falls into each of these tracts. As to the 116.41-acre parcel, the amount obtained was well within the statutory minimum. It has already been established that Smith's appraisals and updates were an adequate and reliable indication of value. Ainsworth extracted nine percent of Smith's last appraised value in his negotiations with Bonita. As to the 43.44-acre parcel, Smith performed an update appraisal on this parcel after a mistake in the description added to its acreage, and he arrived at a new value figure of $360,000 for the entire parcel. The record indicates that LCBE obtained at least $18,038.23 for the lease of the 43.44-acre parcel.[(11)] Even assuming that LCBE was required to obtain five percent of this larger figure for the part of the land currently being leased, it can readily be concluded that it did so. Regardless of the portion of this parcel which was statutorily affected, it would be pro-rated according to the figures cited. Thus, since $18,000 constitutes five percent of $360,000, that percentage was obtained for the statutorily affected portion, albeit barely.

¶50. Appellants offer no evidence that the decision not to defend the confirmation suit was fundamentally flawed. Absent convincing evidence to the contrary, it cannot be said that the members of LCBE or LCBS breached their fiduciary duties. There is substantial evidence to conclude that the school board extracted at least five percent of the fair market value of lands under the school board's control, and the chancellor was not manifestly wrong in determining that adequate consideration was obtained by LCBE on these lands in spite of the Participation Agreement with Hannaford Properties.

VIII.

¶51. Finally, Broadhead and Nicholson claim that the lease on the larger parcel rented to BMLP is invalid because "the uncontroverted testimony contained in the record is that there simply is no appraisal of the 116.41-acre tract of land representing the lease to [BMLP]." Appellees claim this issue is waived under Supreme Court procedure because it was not listed in the appellants' Statement of Issues on Appeal filed on June 5, 1996. The Statement of Issues is required under Miss. R. App. P. Rule 10(b)(4). However, the Comment to Rule 10 clearly states that "[a] designation of certain issues under subdivision (b)(4) does not preclude a party from stating other issues in its brief under Rule 28(a)(3)." Miss. R. App. P. Rule 10 cmt. Thus, the issue will be addressed on the merits.

¶52. Smith conducted appraisals of the original 120-acre parcel and the 40-acre parcel in 1993. On May 26, 1995, Smith combined these parcels and performed his update appraisal on the resulting 159.85-acre tract of land, setting its value at $4,614.00 per acre. BMLP and BPI subsequently decided to lease two separate properties for the mall development, and the land was again split into two parcels, one containing 43.44 acres and the other containing 116.41 acres. A separate appraisal was performed on the smaller parcel because an error in the metes and bounds description in the original Commercial Lease Contract added to its acreage. No separate appraisal was performed on the larger parcel.

¶53. As already noted, these parcels were not divided in the same manner as the earlier 120-acre and 40-acre tracts.[(12)] The 116.41-acre parcel thus includes the southern section of the original 40-acre parcel. The chancellor mischaracterizes the facts in her Opinion when she states that "[t]he 116.41 acre tract leased to [BMLP] is part of the 120-acre tract on which the previous appraisals were conducted." Appellants emphasize this mischaracterization by the court to form their argument.

> Bonita attempts to persuade this Court to take the erroneous position adopted by the Chancery Court and mistakenly subsume the 116.41 acre tract into the original 120 acre tract appraised by Smith on September 1, 1993. . . . The 116.41 acre tract is not "part of" the 120 acres appraised by Smith, nor is it "the same parcel of land" as incorrectly stated by the Chancellor in this case. This can be easily seen by referring to the platted property descriptions of these entirely different tracts of land.

¶54. It is likely that the chancellor's mistake was inadvertent, but, in any event, the mistake is not material to the outcome of this issue. The character of the land is sufficiently similar to the original 120-acre tract. Approximately 100 of the acres were in that tract and the remainder was the southern portion of the former 40-acre parcel, which is topographically similar. Moreover, appellants put forth no contradictory evidence that there was any reason for LCBE to incur the expenses of conducting another appraisal on that land. A competent and reliable update appraisal was done on the combined

tract, which was then divided. LCBE derived the same revenue that it would have gotten had the tract not been divided. When an error occurred adding 1.63 acres to the smaller portion, it was reappraised and adjusted accordingly. No acreage was added to the 116.41-acre parcel. Thus, there is substantial evidence to support the chancellor's findings that "[a] competent appraisal has been performed, and an appropriate letter update of that appraisal was also prepared. The division of property into two parcels for leasing to the two Bonita entities is not a significant change which will require a separate appraisal of the 116.41 acres."

IV.

¶55. For the forgoing reasons, the chancery court's confirmation of the sixteenth section land leases is affirmed.

**¶56. AFFIRMED.**

**PRATHER , P.J., PITTMAN, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., AND SULLIVAN, P.J., NOT PARTICIPATING.**

1. The tract was originally thought to contain 158.23 acres, due to a mistake which omitted approximately 1.63 acres.

2. The so-called "Hannaford Properties" referred to in this litigation essentially comprise the land which was the subject of the original 40-acre appraisal. This land was the subject of a lawsuit between LCBE and Hannaford Properties, L.P., the plaintiffs/then leaseholders of a sixteenth section lease who sought confirmation as to adequacy of consideration. The suit was settled and memorialized in a Participation Agreement by which the five acres of road frontage was confirmed. The remaining thirty-five acres was surrendered back to LCBE and became a part of the two sixteenth section Commercial Lease Contracts now on appeal. Hannaford Properties would also be paid forty percent (40%) of the lease income from the land surrendered back to LCBE. The Participation Agreement was approved by the Secretary of State.

3. Paul Broadhead owns the existing Village Fair Mall in Meridian, and there is disagreement between the parties over the relevance of his true motivations. Broadhead correctly argues he was a defendant in this lawsuit and merely answered the complaint. Therefore, the issues will be addressed on their independent merits without regard to Broadhead's alleged ulterior motives.

4. Likewise, the State of Mississippi did not deny the averments of the complaint.

5. Miss. Const. art. 4, § 95 provides that "[l]ands belonging to, or under the control of the state, shall never be donated directly or indirectly, to private corporations or individuals. . ." This provision has been interpreted to prohibit inadequate consideration for leases on public lands.

6. Scogin originally found multitudinous violations of the Rules, which he recited in an Appraisal Review dated December 27, 1995. However, many of these referenced rules appeared for the first time in the 1995 version of USPAP, and it was brought out at trial that the 1993 version of USPAP

would apply to the appraisals being reviewed since they occurred in 1993.

7. Trial was conducted on March 27, 28 and 29 and April 8, 9, 10 and 12, 1996.

8. *See supra* note 2.

9. Miss. Code Ann. § 29-3-63(2) (Supp. 1996), provides that "[t]he board of education shall not lease or extend a lease on land classified as industrial or commercial at an annual rental less than five percent (5%) of the current market value, exclusive of buildings or improvements not owned by the school district."

10. The original 120-acre parcel consists of the northeast, southeast and southwest quarter-sections of the sixteenth section in issue. The original 40-acre parcel essentially comprised the remaining northwest quarter-section. In the subsequent division, the 43.44-acre parcel lies north of proposed Bonita Lakes Drive and covers roughly the top half of the northeast and northwest quarter-sections; the 116.41-acre parcel lies south and constitutes the remaining land from the combined tract.

11. There is other evidence in the record to suggest that LCBE received slightly more for the lease. Whichever figure was ultimately obtained, it apparently was calculated by applying the new estimate of value only to the acreage which was added.

12. *See supra* note 10.